IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CAMERON MCCRARY, SCHELDON WILLIAMS, ASHLEY WASHINGTON, SHANIQUA RISCHER, JONATHAN DAVIS, PABLO LUNA, JAMES TAYLOR, AND KERRY BILLINGS, | § § § § § § § § § § § § § | CIVIL ACTION NO. 3:20-cv-01264-X |
| Plaintiffs, | | |
| v. | | |
| MIKE BLOOMBERG 2020 INC., | | |
| Defendant. | | |

**APPENDIX IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT OR, ALTERNATIVELY, TO TRANSFER OR STAY**

| Exhibit | Description | Appendix Pages |
|---|---|---|
| A | At-Will Agreement of Cameron McCrary | 001-015 |
| B | At-Will Agreement of Scheldon Williams | 016-029 |
| C | At-Will Agreement of Ashley Washington | 030-045 |
| D | At-Will Agreement of Shaniqua Rischer | 046-060 |
| E | At-Will Agreement of Jonathan Davis | 061-075 |
| F | At-Will Agreement of Pablo Luna | 076-090 |
| G | At-Will Agreement of James Taylor | 091-105 |
| H | At-Will Agreement of Kerry Billings | 106-120 |
| I | Mike Bloomberg 2020, Inc.'s Certificate of Incorporation | 121-124 |
| J | Mike Bloomberg 2020, Inc.'s Statement of Organization | 125-129 |
| K | *Wood et al. v. Mike Bloomberg 2020, Inc.*, No. 1:20-cv-02489, First Am. Compl. (S.D.N.Y. Mar. 30, 2020) | 130-214 |

Dated:  August 24, 2020.

Respectfully submitted,

*/s/ J. Meghan McCaig*
Greg W. Curry
State Bar No. 05270300
Greg.Curry@tklaw.com

J. Meghan McCaig
State Bar No. 24070083
Meghan.McCaig@tklaw.com

Dina McKenney
State Bar No. 24092809
Dina.McKenney@tklaw.com

Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas  75201
(214) 969-1700
(214) 969-1751 (facsimile)

ATTORNEYS FOR DEFENDANT

# EXHIBIT A

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

February 5, 2020

Cameron McCrary

Re:      Offer of Employment

Dear Cameron:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 10, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

**App. 002**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT A**

1.     No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,                                                    Acknowledged and agreed to
                                                                This Date,
                                                                 2/5/2020

_____                          _____
Katherine Sayers                                   Cameron McCrary
February 5, 2020

**App. 003**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1. Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2. Employee's regular rate of pay: $3,000.00 semi-monthly

3. FLSA Status: Exempt

4. Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

_Cameron McCrary_
8E19B44BD1404E8...

_____

Cameron McCrary

2/5/2020

_____

Date

-3-

**App. 004**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT A**

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.     **Confidential Information**.

(a)    Organization Group Information.  I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members.  In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Organization.  I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential.  I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)    Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)    Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 005**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)        Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.        **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.        **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.        **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.        **Restrictions on Interfering**.

(a)        During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)        For purposes of this Agreement:

(i)        "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 006**

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)     "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.     **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.     **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.     **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 007**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9.     **Cooperation**.

(a)     I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)     I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10.     **General Provisions**.

(a)     <u>Governing Law and Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)     <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)     <u>No Right of Continued Employment</u>.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)     <u>Successors and Assigns</u>.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     Survival.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     Counterparts. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*        *        *

**App. 009**

**EXHIBIT A**

       I, Cameron McCrary, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/5/2020

Cameron McCrary

Acknowledged, accepted and agreed:

By: _____

    Name: Katherine Sayers
    Title: Authorized Signatory
    Date: February 5, 2020

**App. 010**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 011**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT B**

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 012**

**EXHIBIT B**

## CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF
## MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

*Cameron McCrary*

—8E19B44BD1404E8...

Name: Cameron McCrary

2/5/2020

**App. 013**

DocuSign Envelope ID: CFBDBC98-C65C-4163-8B18-035166E162EC

**EXHIBIT C**

## Prevention of Coordination Policy

Effective February 5, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

-13-

**App. 014**

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature      *Cameron McCrary*
DocuSigned by:
8E19B44BD1404E8...

Name: Cameron McCrary

2/5/2020

EXHIBIT B

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022


February 5, 2020


Scheldon Williams


Re:    Offer of Employment


Dear Scheldon:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 10, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.     The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.     As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

**App. 017**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT A**

1.    No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,

Acknowledged and agreed to
This Date,
 2/5/2020

_____

Katherine Sayers
February 5, 2020

DocuSigned by:

2B6D2BFAFEB0432...

_____

Scheldon Williams

**App. 018**

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1.  Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2.  Employee's regular rate of pay: $3,000.00 semi-monthly

3.  FLSA Status: Exempt

4.  Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

_____
Scheldon Williams

2/5/2020
_____
Date

**App. 019**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT A**

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.      **Confidential Information**.

(a)      Organization Group Information.  I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members.  In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Organization.  I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential.  I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)      Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)      Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 020**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)    Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.    **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.    **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.    **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.    **Restrictions on Interfering**.

(a)    During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)    For purposes of this Agreement:

(i)    "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 021**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)    "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)    "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)    Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.    **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.    **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.    **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9. **Cooperation**.

(a) I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b) I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10. **General Provisions**.

(a) <u>Governing Law and Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b) <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c) <u>No Right of Continued Employment</u>.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d) <u>Successors and Assigns</u>.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 023**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     <u>Counterparts</u>. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*       *       *

**App. 024**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT A**

I, Scheldon Williams, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/5/2020

Scheldon Williams

Acknowledged, accepted and agreed:

By: _____

    Name: Katherine Sayers
    Title: Authorized Signatory
    Date: February 5, 2020

**App. 025**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 026**

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 027**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT B**

**CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF
MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT**

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

DocuSigned by:

_____2B8D2BFAFEB0432..._

Name: Scheldon Williams

2/5/2020

**App. 028**

DocuSign Envelope ID: 46BBB752-BCA3-4E5A-8079-7EA6EF7805E4

**EXHIBIT C**

## Prevention of Coordination Policy
Effective February 5, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 029**

**EXHIBIT C**

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature

Name: Scheldon Williams

2/5/2020

**App. 030**

# EXHIBIT C

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

February 4, 2020

Ashley Washington

Re:      Offer of Employment

Dear Ashley:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 10, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

App. 032

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

1.      No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,                                          Acknowledged and agreed to
                                                   This Date,
                                                    2/4/2020

Katherine Sayers                                   Ashley Washington
February 4, 2020

**App. 033**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1.  Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2.  Employee's regular rate of pay: $3,000.00 semi-monthly

3.  FLSA Status: Exempt

4.  Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

_Ashley Washington_

2122DE480FD94AA...

_____

Ashley Washington

2/4/2020

_____

Date

-3-

**App. 034**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT A**

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.      **Confidential Information**.

(a)      Organization Group Information.  I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members.  In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Organization.  I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential.  I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)      Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)      Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 035**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)      Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.      Invention Assignment.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.      Returning Organization Group Documents.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.      Disclosure of Agreement.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.      Restrictions on Interfering.

(a)      During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)      For purposes of this Agreement:

(i)      "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 036**

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)    "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.      **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.      **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.      **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 037**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9.      **Cooperation**.

(a)      I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)      I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10.     **General Provisions**.

(a)      Governing Law and Jurisdiction.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)      Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)      No Right of Continued Employment.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)      Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 038**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     Survival.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     Counterparts. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*       *       *

App. 039

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT A**

I, Ashley Washington, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/4/2020

Ashley Washington

Acknowledged, accepted and agreed:

By: _____
    Name: Katherine Sayers
    Title: Authorized Signatory
    Date: February 4, 2020

**App. 040**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 041**

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT B**

## CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF
## MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

*Ashley Washington*

2122DE480FD94AA...

Name: Ashley Washington

2/4/2020

**App. 043**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

**EXHIBIT C**

### Prevention of Coordination Policy
Effective February 4, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

-13-

**App. 044**

DocuSign Envelope ID: 1C5EF37E-6663-481C-B37A-EAA612997BBF

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature  *Ashley Washington*
DocuSigned by:
2122DE480FD94AA...

Name: Ashley Washington

2/4/2020

-14-

**App. 045**

EXHIBIT D

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

February 5, 2020

Shaniqua Rischer

Re:      Offer of Employment

Dear Shaniqua:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 10, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

**App. 047**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT A**

1. No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,

Acknowledged and agreed to
This Date,
 2/8/2020

_____
Katherine Sayers
February 5, 2020

DocuSigned by:

_____
Shaniqua Rischer

-2-

**App. 048**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1. Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2. Employee's regular rate of pay: $3,000.00 semi-monthly

3. FLSA Status: Exempt

4. Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

*Shaniqua Rischer*

CFC371053ECF4D8...

_____

Shaniqua Rischer

2/8/2020

_____

Date

-3-

**App. 049**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

### CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1. **Confidential Information**.

(a) Organization Group Information. I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Organization. I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided, however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b) Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c) Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 050**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)     Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.     **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.     **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.     **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.     **Restrictions on Interfering**.

(a)     During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)     For purposes of this Agreement:

(i)     "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 051**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT A**

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

              (ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

              (iii)     "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

        (c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

        6.     **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

        7.     **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

        8.     **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 052**

**EXHIBIT A**

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9. **Cooperation**.

(a)     I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)     I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10. **General Provisions**.

(a)     Governing Law and Jurisdiction.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)     Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)     No Right of Continued Employment.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)     Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 053**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

EXHIBIT A

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     <u>Counterparts</u>. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*      *      *

App. 054

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT A**

I, Shaniqua Rischer, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/8/2020

Shaniqua Rischer

Acknowledged, accepted and agreed:

By: _____
    Name: Katherine Sayers
    Title: Authorized Signatory
    Date: February 5, 2020

**App. 055**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 056**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

**EXHIBIT B**

## CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF
## MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

CFC371053ECF4D8...

Name: Shaniqua Rischer

2/8/2020

**App. 058**

DocuSign Envelope ID: 4CB8181B-03C3-461D-8D84-A9D87790D4E0

## Prevention of Coordination Policy

Effective February 5, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 059**

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature _Shaniqua Rischer_
DocuSigned by:
CFC371053ECF4D8...

Name: Shaniqua Rischer

2/8/2020

**App. 060**

# EXHIBIT E

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

February 6, 2020

JONATHAN DAVIS

Re:     Offer of Employment

Dear JONATHAN:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 10, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

**App. 062**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

**EXHIBIT A**

1.      No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,                                              Acknowledged and agreed to
                                                        This Date,
                                                         2/6/2020

_____                                   _____
Katherine Sayers                                        JONATHAN DAVIS
February 6, 2020

**App. 063**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1. Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2. Employee's regular rate of pay: $3,000.00 semi-monthly

3. FLSA Status: Exempt

4. Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

_____
JONATHAN DAVIS

2/6/2020

_____
Date

-3-

**App. 064**

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.      **Confidential Information**.

(a)     Organization Group Information.  I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members.  In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Organization.  I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential.  I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)     Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)     Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 065**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)  Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.  **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.  **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.  **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.  **Restrictions on Interfering**.

(a)  During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)  For purposes of this Agreement:

(i)  "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 066**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)     "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.     **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.     **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.     **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 067**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

## 9. **Cooperation**.

(a)     I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)     I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

## 10. **General Provisions**.

(a)     Governing Law and Jurisdiction.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)     Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)     No Right of Continued Employment.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)     Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 068**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

**EXHIBIT A**

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

          (e)    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

          (f)    <u>Counterparts</u>. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*     *     *

**App. 069**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

I, JONATHAN DAVIS, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/6/2020

JONATHAN DAVIS

Acknowledged, accepted and agreed:

By: _____

Name: Katherine Sayers
Title: Authorized Signatory
Date: February 6, 2020

**App. 070**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 071**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 072**

**EXHIBIT B**

### CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF
### MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

DocuSigned by:

DFFD82623823437...

Name: JONATHAN DAVIS

2/6/2020

**App. 073**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

**EXHIBIT C**

## Prevention of Coordination Policy

Effective February 6, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

  a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

  b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

  c. The means or mode of the Committee's public communications;

  d. The timing or frequency of the Committee's public communications;

  e. The intended geographic or demographic audience of the Committee's public communications;

  f. The size (in dollars, time, or media points) of any media buys;

  g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

  h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

  "Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 074**

DocuSign Envelope ID: 39D9214E-8A1D-4B74-9F2C-864FC4EDBE72

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature

DFFD82623823437...

Name: JONATHAN DAVIS

2/6/2020

**App. 075**

# EXHIBIT F

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

February 13, 2020

Pablo Luna

Re:      Offer of Employment

Dear Pablo:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization. Assuming the required documentation is complete, we look forward to welcoming you on February 17, 2020.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization. Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

**App. 077**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT A**

1.      No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,

Acknowledged and agreed to
This Date,
 2/13/2020

_____

Katherine Sayers
February 13, 2020

DocuSigned by:

*Pablo Luna*

8602CDD4CCAF4A1...

Pablo Luna

**App. 078**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT A**

Notice and Acknowledgement of Pay Rate and Pay Day

1. Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2. Employee's regular rate of pay: $3,000.00 semi-monthly

3. FLSA Status: Exempt

4. Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

DocuSigned by:

*Pablo Luna*

8602CDD4CCAF4A1...

_____

Pablo Luna

2/13/2020

_____

Date

-3-

**App. 079**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT A**

### CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.      **Confidential Information**.

(a)     Organization Group Information.  I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members.  In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create.  I further agree not to make copies of such Confidential Information except as authorized by the Organization.  I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential.  I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)     Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)     Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 080**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT A**

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)     Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.     **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.     **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.     **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.     **Restrictions on Interfering**.

(a)     During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)     For purposes of this Agreement:

(i)     "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 081**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)     "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.     **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.     **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.     **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 082**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9.      **Cooperation**.

(a)      I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)      I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10.      **General Provisions**.

(a)      Governing Law and Jurisdiction.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)      Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)      No Right of Continued Employment.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)      Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 083**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     Survival.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     Counterparts. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*       *       *

App. 084

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT A**

      I, Pablo Luna, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

2/13/2020

DocuSigned by:

*Pablo Luna*

8602CDD4CCAF4A1...

Pablo Luna

Acknowledged, accepted and agreed:

By: _____

    Name: Katherine Sayers
    Title: Authorized Signatory
    Date: February 13, 2020

**App. 085**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 086**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT B**

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 087**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT B**

**CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF**
**MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT**

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

*Pablo Luna*
8602CDD4CCAF4A1...

Name: Pablo Luna

2/13/2020

**App. 088**

DocuSign Envelope ID: 513D998E-18D1-443A-900A-9E42FDA88DE5

**EXHIBIT C**

## Prevention of Coordination Policy
Effective February 13, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 089**

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature [DocuSigned by: *Pablo Luna* 8602CDD4CCAF4A1...]

Name: Pablo Luna

2/13/2020

-14-

**App. 090**

# EXHIBIT G

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

January 26, 2020

James Taylor

Re:      Offer of Employment

Dear James:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization.  We look forward to your coming onboard.

You will be compensated at the rate of $3,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

In addition, the Organization will reimburse the actual and reasonable out-of-pocket relocation expenses ("Relocation Expenses") you incur, in an amount not to exceed $5,000.00. Qualified Relocation Expenses, subject to the $5,000.00  cap, may include: (1) travel expenses for you and your family in conjunction with house hunting and other relocation matters, (2) lease termination fees, brokerage fees and commissions and closing costs related to the purchase or sale of your primary home, (3) fees for consultants associated with your transition, (4) rent or mortgage expenses during the first year of employment, and (5) relocation of household goods and cars. To be reimbursed for any out-of-pocket relocation expenses, please promptly submit receipts reflecting each such expense to humanresources@mikebloomberg.com. Please note that the aforementioned may be subject to taxation. Mike Bloomberg 2020 Inc. will assume the cost of any payroll tax liabilities associated with these relocation expenses.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization.  Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits

App. 092

to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

    1.      No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,                                              Acknowledged and agreed to
                                                        This Date,
                                                         1/26/2020

_____                                   _____
Katherine Sayers                                        James Taylor
January 26, 2020

App. 093

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

Notice and Acknowledgement of Pay Rate and Pay Day

1. Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

2. Employee's regular rate of pay: $3,000.00 semi-monthly

3. FLSA Status: Exempt

4. Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

DocuSigned by:

*James Taylor*

844868A02033424...

_____

James Taylor

1/26/2020

_____

Date

-3-

**App. 094**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.      **Confidential Information**.

(a)      Organization Group Information. I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Organization. I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)      Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)      Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

(d)      Former Employer Information.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

2.      **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

3.      **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

4.      **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

5.      **Restrictions on Interfering**.

(a)      During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

(b)      For purposes of this Agreement:

(i)      "Interfering Activities" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

**App. 096**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)     "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)     "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)     Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.     **Reasonableness of Restrictions**.   I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.   I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.     **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.     **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 097**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9.  **Cooperation**.

(a)  I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)  I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10.  **General Provisions**.

(a)  <u>Governing Law and Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)  <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)  <u>No Right of Continued Employment</u>.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)  <u>Successors and Assigns</u>.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 098**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

**EXHIBIT A**

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

       (e)    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

       (f)    <u>Counterparts</u>. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*      *      *

**App. 099**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

**EXHIBIT A**

I, James Taylor, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

1/26/2020

James Taylor

Acknowledged, accepted and agreed:

By: _____
     Name: Katherine Sayers
     Title: Authorized Signatory
     Date: January 26, 2020

**App. 100**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 101**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

## V. Social Media

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

## VI. Policies and Procedures

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 102**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

**EXHIBIT B**

## CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

Signature

James Taylor

844868A02033424...

Name: James Taylor

1/26/2020

**App. 103**

DocuSign Envelope ID: 93C538D1-BE61-4CCD-9FD9-E24ADFAE22CE

**EXHIBIT C**

## Prevention of Coordination Policy

Effective January 26, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 104**

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

Signature 

Name: James Taylor

1/26/2020

**App. 105**

# EXHIBIT H

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

Mike Bloomberg 2020 Inc.
c/o 909 Third Avenue, 15th floor
New York, NY 10022

January 13, 2020

Kerry Billings

Re:   <u>Offer of Employment</u>

Dear Kerry:

On behalf of Mike Bloomberg 2020 Inc. (the "Organization"), it is my pleasure to formally confirm our offer to you to join the Organization.  We look forward to your coming onboard.

You will be compensated at the rate of $4,000.00 semi-monthly.  Such compensation shall be payable biweekly or bimonthly in accordance with the Organization's regular payroll practices.  In light of your job duties and compensation, this position is classified as exempt from the overtime provisions of federal and applicable state laws.

In addition, the Organization will reimburse the actual and reasonable out-of-pocket relocation expenses ("Relocation Expenses") you incur, in an amount not to exceed $5,000.00. Qualified Relocation Expenses, subject to the $5,000.00  cap, may include: (1) travel expenses for you and your family in conjunction with house hunting and other relocation matters, (2) lease termination fees, brokerage fees and commissions and closing costs related to the purchase or sale of your primary home, (3) fees for consultants associated with your transition, (4) rent or mortgage expenses during the first year of employment, and (5) relocation of household goods and cars. To be reimbursed for any out-of-pocket relocation expenses, please promptly submit receipts reflecting each such expense to humanresources@mikebloomberg.com. Please note that the aforementioned may be subject to taxation. Mike Bloomberg 2020 Inc. will assume the cost of any payroll tax liabilities associated with these relocation expenses.

You will be eligible to participate in all employee benefits plans from time to time adopted by the Organization and in effect for similarly situated employees of the Organization and to paid vacation, to be accrued and taken in accordance with Organization policy.  Notwithstanding the foregoing, the Organization expressly reserves the right to amend, modify or terminate any employee benefit plan or policy at any time, with or without notice.

The Organization may withhold and deposit all federal, state, and local income and employment taxes that are owed with respect to all amounts paid or benefits provided to or for you by the Organization.

The nature of your employment at the Organization is and will continue to be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason.  Upon any termination of your employment for any reason, no further payments by the Organization to you will be due other than accrued but unpaid salary through the applicable date of your termination and any other accrued benefits

**App. 107**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

to which you may be entitled pursuant to the terms of benefits plans in which you participate at the time of such termination.

1.      The Organization's offer hereunder is contingent on the acceptable results of a background investigation.  In the event that the results of the background check are not acceptable to the Organization in its reasonable discretion, this offer shall be void *ab initio*.

2.      As a condition of, and prior to commencement of, your employment with the Organization, you shall have executed and delivered to the Organization the Confidentiality, Non-Interference, and Invention Assignment Agreement and Code of Conduct attached hereto as Exhibits A and B, respectively.

1.      No statement varying any of the terms of this offer letter shall be enforceable unless set forth in a writing signed by a duly authorized officer of the Organization.

We are very excited to have you as a part of the Organization's team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely,                                                      Acknowledged and agreed to
                                                                This Date,
                                                                 1/13/2020



_____                          _____
Katherine Sayers                                           Kerry Billings
January 13, 2020

**App. 108**

Notice and Acknowledgement of Pay Rate and Pay Day

    1.   Employer Information

Name:  Mike Bloomberg 2020 Inc.

Doing Business As (DBA) Name(s):  n/a

Physical Address: 909 Third Avenue, NY, NY 10022

Mailing Address: 909 Third Avenue, NY, NY 10022

Phone: 212-583-6001

    2.   Employee's regular rate of pay: $4,000.00 semi-monthly

    3.   FLSA Status: Exempt

    4.   Regular Payday: Semi-Monthly on the 15th and last business day of the month

I acknowledge receipt of this notice of my pay rate and designated pay day:

*Kerry Billings*

0C70CA8CECB944A...

_____

Kerry Billings

1/13/2020

_____

Date

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

**EXHIBIT A**

## CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed by Mike Bloomberg 2020 Inc. (the "Organization") and in consideration of my employment with the Organization and my receipt of the compensation now and hereafter paid to me by the Organization, I agree to the following terms of this Confidentiality, Non-Interference, and Invention Assignment Agreement (the "Agreement"):

1.    **Confidential Information**.

(a)    Organization Group Information. I acknowledge that, during the course of my employment (the "Employment Period"), I will have access to information about the Organization and any member(s) and affiliates, including Michael R. Bloomberg (each, an "Organization Group Member" and, collectively, the "Organization Group") and that my employment with the Organization shall bring me into close contact with confidential and proprietary information of one or more Organization Group Members. In recognition of the foregoing, I agree, at all times during the Employment Period and thereafter, to hold in confidence, and not to use, except for the benefit of Organization Group Members, or to disclose to any person, firm, corporation, or other entity without written authorization of the Organization, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Organization. I understand that "Confidential Information" means non-public information, ideas, plans and/or strategies that one or more Organization Group Members has or will develop, acquire, create, compile, discover, or own, and that the Organization wishes to maintain as confidential. I understand that Confidential Information includes, but is not limited to, any and all non-public information that relates to the actual or anticipated political activities, strategies, plans, positions, work product, analytics, research, or development of an Organization Group Member, or to an Organization Group Member's technical data, trade secrets, or know-how, including, but not limited to, research, campaign plans, or other information regarding an Organization Group Member's activities, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other information disclosed by an Organization Group Member either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Organization Group property. Confidential Information also includes, but is not limited to, the strategies and non-public activities of the Organization Group. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items that have become publicly and widely known through no unauthorized disclosure by me or others who were under confidentiality obligations as to the item or items involved, or (ii) any information that I am required to disclose to, or by, any governmental or judicial authority; *provided*, *however*, that in such event (unless legally prohibited from doing so) I will give the Organization prompt written notice thereof so that the Organization Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Agreement.

(b)    Ownership. All Confidential Information, in whatever form provided, shall remain the property of the Organization or the Organization Group, as applicable.

(c)    Use of Organization Materials. I shall not, without the Organization's prior written consent, use equipment, materials, data and/or network access provided by the Organization (the "Organization Materials"), including, but not limited to, electronic mail, voice mail, pagers, telephones, Internet access, postage, copy and fax machines, computer equipment, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or for any reason other than in the course of performing services for the Organization. The Organization Materials are and shall remain the property of the Organization at all times. The Organization reserves the right to access, inspect, review, copy, remove, change or disclose

**App. 110**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

the contents of the Organization Materials. Accordingly, I should not expect privacy in communications through the Organization Materials.

       (d)    <u>Former Employer Information</u>.  I represent that my performance of all of the terms of this Agreement as an employee of the Organization has not breached and will not breach any agreement to keep in confidence any information, knowledge, or data acquired by me in confidence or trust prior or subsequent to the commencement of my employment with the Organization, and I will not disclose to any Organization Group Member, or induce any Organization Group Member to use, any developments, or confidential or proprietary information or material I may have obtained in connection with employment with any prior employer in violation of a confidentiality agreement, nondisclosure agreement, or similar agreement with such prior employer.

       2.    **Invention Assignment**.  I agree that all data, reference materials, memoranda, documentation, and any and all work product conceived, created, reduced to any medium or expression in any way incorporating or reflecting any Confidential Information, and any original works of authorship, derivative works, inventions, developments, concepts, trade secrets or ideas, which are or have been conceived or developed in whole or in part by me alone or in conjunction with others, whether or not conceived or developed during regular working hours, and which are made through the use of any Confidential Information or any of the Organization Group's equipment, facilities, supplies or trade secrets, or which relate to the Organization Group's business, or which result from any work performed by me for the Organization Group (collectively, "Proprietary Rights"), belong exclusively to the Organization Group, and I agree to assign all rights, title and interest in and to all such Proprietary Rights to the Organization at any time before or after the termination of my employment, and to take such other actions, and to execute such other documents, to give effect to the foregoing as may be requested at any time or from time to time by the Organization.

       3.    **Returning Organization Group Documents**.  I agree that, at the time of termination of my employment with the Organization for any reason, I will return to the Organization and/or fully delete (and, in the case of deletion, demonstrate such deletion to the Organization's satisfaction) (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Organization Group.  I agree further that any property situated on the Organization's premises and owned by the Organization (or any other Organization Group Member), including disks and other storage media, filing cabinets, and other work areas, is subject to inspection by personnel of any Organization Group Member at any time with or without notice.

       4.    **Disclosure of Agreement**.  As long as it remains in effect, I will disclose the existence of this Agreement to any prospective employer, venture or client prior to entering into an employment, consulting, or other business relationship with such person or entity.

       5.    **Restrictions on Interfering**.

       (a)    During the Employment Period and the Post-Termination Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities.

       (b)    For purposes of this Agreement:

       (i)    "<u>Interfering Activities</u>" shall mean (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any Organization Group Member to terminate

such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Organization Group; (B) hiring any Person who was employed by the Organization Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting or inducing, or in any manner attempting to encourage, solicit or induce any client, account, licensee or other business relation of any Organization Group Member to cease doing business with or reduce the amount of business conducted with the Organization Group, or in any way interfere with the relationship between any such client, account, licensee or business relation and the Organization Group.

(ii)      "Person" shall mean any individual, corporation, partnership, limited liability Organization, joint venture, association, joint-stock Organization, trust (charitable or non-charitable), unincorporated organization or other form of business entity.

(iii)      "Post-Termination Non-Interference Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the thirty-six (36) month anniversary of such date of termination.

(c)      Non-Disparagement.  I agree that during the Employment Period, and at all times thereafter, I will not make any disparaging or defamatory comments regarding any Organization Group Member or their respective current or former owners, directors, officers, or employees in any respect or make any comments concerning any aspect of my relationship with any Organization Group Member or any conduct or events which precipitated any termination of my employment from any Organization Group Member.  However, my obligations under this subparagraph (c) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency.

6.      **Reasonableness of Restrictions**.  I recognize and acknowledge that the restrictions and limitations set forth in this Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Organization Group.  I further acknowledge that the restrictions and limitations set forth in this Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Organization and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Organization.

7.      **Independence; Severability; Blue Pencil**.  Each of the rights enumerated in this Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Organization Group at law or in equity.  If any of the provisions of this Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.      **Injunctive Relief**.  I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Agreement may result in substantial, continuing and irreparable injury to the members of the Organization Group.  Therefore, I hereby agree that, in addition to any other remedy that may be available to the Organization, any Organization Group Member shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Agreement without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach.

**App. 112**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Non-Interference Period, as applicable, shall be tolled during any period of violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Organization or any other Organization Group Member seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

9. **Cooperation**.

(a)  I agree that, following any termination of my employment, I will continue to provide reasonable cooperation to the Organization and/or any other Organization Group Member and its or their respective counsel in connection with any investigation, administrative proceeding or litigation relating to any matter that occurred during my employment in which I was involved or of which I have knowledge.  As a condition of such cooperation, the Organization shall reimburse me for reasonable out-of-pocket expenses incurred at the request of the Organization with respect to my compliance with this paragraph.

(b)  I also agree that, in the event I am subpoenaed by any person or entity (including, but not limited to, any government agency) to give testimony or provide documents (in a deposition, court proceeding or otherwise) which in any way relates to my employment by the Organization and/or any other Organization Group Member, I will give prompt notice of such request to Diane Gubelli, Geller & Co. (or his/her successor or designee) and will make no disclosure until the Organization and/or the other Organization Group Member have had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure.

10. **General Provisions**.

(a)  <u>Governing Law and Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the United States of America and the State of New York, without giving effect to the principles of conflict of laws. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of this Agreement and to waive any objection to the propriety or convenience of venue in such courts.

(b)  <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding between the Organization and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.  No waiver by the Organization of my breach of this Agreement shall operate as a waiver of any subsequent breach.

(c)  <u>No Right of Continued Employment</u>.  I acknowledge and agree that nothing contained herein shall be construed as granting me any right to continued employment by the Organization, and the right of the Organization to terminate my employment at any time and for any reason, with or without cause, is specifically reserved.

(d)  <u>Successors and Assigns</u>.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Organization, its successors, and its assigns. I expressly acknowledge and agree that this Agreement may be assigned by the Organization without my consent to any other Organization Group Member as well as any purchaser of all or substantially all of the assets or stock of the Organization, whether by purchase, merger or other similar

**App. 113**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

corporate transaction; provided that any license or rights to intellectual property, or rights to receive the assignment thereof, granted pursuant to Section 2 may be assigned by the Organization without my consent to any third party.

(e)     <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Organization and/or the assignment of this Agreement by the Organization to any successor in interest or other assignee.

(f)     <u>Counterparts</u>. This Agreement, and any modifications, waivers or notifications relating thereto, may be executed and delivered by facsimile. Any such facsimile shall constitute the final agreement of the parties and conclusive proof of such agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and which together shall be deemed to constitute one instrument.

*       *       *

**App. 114**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

**EXHIBIT A**

I, Kerry Billings, have executed this Confidentiality, Non-Interference and Invention Assignment Agreement on the date set forth below:

1/13/2020

Kerry Billings

Acknowledged, accepted and agreed:

By: _____

Name: Katherine Sayers
Title: Authorized Signatory
Date: January 13, 2020

**App. 115**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

**EXHIBIT B**

# CODE OF CONDUCT

All employees, interns, and campaign workers (collectively, "Covered Individuals") who perform services for Mike Bloomberg 2020, Inc. (the "Organization") are expected to conduct themselves at all times in an honest, ethical manner and to comply with all laws and regulations. To that end, all Covered Individuals are bound by the following rules and standards:

## I. Ethical and Appropriate Behavior

The Organization expects that all Covered Individuals will act in accordance with the professional ethics applicable to their field and the professional and business goals of the Organization. Covered Individuals are required to act responsibly and reasonably if they become aware of behavior that may violate any ethical standard, and report it to the appropriate agent of the Organization.

The Organization also prohibits the following conduct: (i) insubordination; (ii) willful misconduct; (iii) negligence; (iv) possession of weapons or illegal drugs; (v) bribery; (vi) theft, fraud, or embezzlement; (vii) bullying or violence; (viii) falsification of records or documentation; and (ix) encouragement, directing, facilitation, or permitting a violation of laws or Organization policies and procedures.

## II. Confidential Information

In addition to any obligations Covered Individuals may have under a confidentiality agreement with the Organization, Covered Individuals must not use, disclose, or comment on any highly sensitive confidential and proprietary information concerning the Organization and its personnel. This prohibition extends to any medium, including the use of social media platforms.

## III. Statements to the Press or Other Media Members

Covered individuals shall not make unauthorized statements to the press or other members of the media regarding the Organization, the Organization's officers, or the Organization's constituents. This prohibition against unauthorized statements to the press or other members of the media shall prohibit all Covered Individuals from, directly or indirectly, participating in the creation or preparation of any books, memoirs, articles, blogs, vlogs, movies, television programs, or stories of any kind concerning the Organization, the Organization's Officers, or the Organization's constituents, unless such activities are in furtherance of the Covered Individual's authorized performance of services on behalf of the Organization.

## IV. Conflicts of Interest

Covered Individuals must avoid all actual, potential, or perceived Conflicts of Interest while employed or engaged by the Organization. A "Conflict of Interest" is a transaction or relationship which presents or may present a conflict between the Covered Individual's obligations to the Organization and any personal, business, or other interests of a Covered Individual. Conflicts of Interest include, without limitation, relationships or activities which may be directly or indirectly

**App. 116**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

adverse to the interests of the Organization. For the avoidance of doubt, and without limiting the foregoing examples, any financial interest or business relationship that a Covered Individual may have with or in a vendor or other business partner of the Organization shall be considered a Conflict of Interest for purposes of this Code of Conduct. A Covered Individual's obligation to avoid all Conflicts of Interest includes the obligation to ensure that he or she does not accept financial consideration from another Covered Individual in exchange for or directing business to such Covered Individual. In the event an actual or potential Conflict of Interest arises during a Covered Individual's employment, engagement, or other business association with the Organization, the Covered Individual must promptly disclose to the Organization the circumstances of such actual or potential Conflict of Interest.

**V. Social Media**

While the Organization recognizes the importance of social media in the achievement of its professional and business goals, Covered Individuals must be mindful of their participation on social media and the impact it may have on the Organization or any of its agents or representatives. As a result, Covered Individuals must not participate on behalf of the Organization in social media discussions, comments, or postings without the express written authorization of the Organization. Instead, Covered Individuals must make clear to the public when communicating via social media that their communications reflect their own personal opinions and not the opinions of the Organization, unless the Covered Individual is expressly authorized to communicate on behalf of the Organization. Covered Individuals are also reminded of their obligations to maintain confidential information and abide by laws and internal policies on discrimination, harassment, and retaliation when communicating via social media.

**VI. Policies and Procedures**

Covered Individuals must abide by the policies and procedures set forth in the Employee Handbook and any documents or agreements incorporated therein, including the Anti- Coordination policy.

The above rules and standards may not address every issue a Covered Individual may face during his or her employment or engagement with the Organization, but is meant to demonstrate the general guidelines by which Covered Individuals must abide. Failure to abide by the foregoing rules and standards may result in disciplinary action, up to and including termination of employment, at the sole discretion of the Organization.

If you have any questions about the applicability or interpretation of the rules or expectations set forth in this Code of Conduct, or the propriety of any of your contemplated actions, please contact humanresources@mikebloomberg.com.

Covered Individuals must sign, date, and return the attached Certification stating that they received this Code of Conduct and that they agree to comply with it to humanresources@mikebloomberg.com. **Please note that Covered Individuals are bound by the Code of Conduct regardless of whether they execute and return the attached certification**.

**App. 117**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

**EXHIBIT B**

### CERTIFICATION OF RECEIPT AND ACKNOWLEDGMENT OF TERMS OF MIKE BLOOMBERG 2020, INC. CODE OF CONDUCT

I hereby acknowledge that I have received, read, and understood the Code of Conduct and agree to abide by the policies and terms contained therein. I understand that the Code of Conduct may be amended from time to time at the sole discretion of Mike Bloomberg 2020, Inc. (the "Organization"), and that my obligations with respect to abiding by any altered or amended terms shall not change. I understand that observance of the Code of Conduct is a material condition of employment or engagement with the Organization and that any violation of any provision of the Code of Conduct by me or my agents may be grounds for immediate termination of my employment/engagement/association with the Organization. I acknowledge that the Code of Conduct does not create a contract of employment, nor does it alter that at-will nature of any employment relationship with the Organization.

By signing below, I agree to abide by the Code of Conduct and affirm that I have not previously violated any provisions contained therein.

DocuSigned by:

*kerry Billings*

0C70CA8CECB944A...

1/13/2020

-12-

**App. 118**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

**EXHIBIT C**

## Prevention of Coordination Policy
Effective January 13, 2020

By signing below, I indicate that I agree to the following:

1. At no time while I am an officer, director, employee, independent contractor, or volunteer of Mike Bloomberg 2020, Inc. ("Committee") will I discuss with any individual organization, corporation, nonprofit, or other person, who is considering undertaking independent efforts to support Michael R. Bloomberg or oppose any of his opponents ("Independent Entity") nonpublic information regarding any of the following:

> a. The plans, projects, activities or needs of the Committee or Michael R. Bloomberg;

> b. Content or messaging regarding any of the Committee's public communications or its general media strategy;

> c. The means or mode of the Committee's public communications;

> d. The timing or frequency of the Committee's public communications;

> e. The intended geographic or demographic audience of the Committee's public communications;

> f. The size (in dollars, time, or media points) of any media buys;

> g. The specific media outlets that the Committee plans to use (or is considering using) for communications; or

> h. The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite, for any of the Committee's communications.

"Discuss" includes (1) providing information about any of the topics identified above to the Independent Entity, (2) listening to suggestions or requests from the Independent Entity about any of the topics identified above, (3) making suggestions about any of the topics identified above to the Independent Entity, or (4) having the Committee assent to proposals about the topics identified above from the Independent Entity.

2. I have not and will not accept from the Independent Entity any polling data, polling questions, media ratings information, or results of focus groups paid for by the Independent Entity.

3. If I am an employee, vendor, or independent contractor to the Committee, I agree that I will not use or

**App. 119**

DocuSign Envelope ID: D685D765-B7F5-4737-B8C7-77734E06740E

share any information about the Committee (other than information that is publicly available) for 120 days after I cease being an employee, vendor, or independent contractor to the Committee, for purposes of doing any of the following for any Independent Entity:

> a. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that expressly advocate the election of Michael R. Bloomberg or the defeat of any of the other candidates in a primary, general, runoff, special, or any other election in which Michael R. Bloomberg is on the ballot; or

> b. Creating, producing, or distributing a communication disseminated by radio, television, outdoor advertisement, mailing 500 substantially similar mail pieces, or making 500 substantially similar telephone calls that refers to Michael R. Bloomberg or any of the other candidates that will be disseminated within 120 days of a primary, general, runoff, special, or any other election in which the Supported Candidate will be on the ballot.

4. If I raise funds for an Independent Entity, I will abide by the following:

> a. I will not tell any potential donor that Michael R. Bloomberg would appreciate a contribution made to the Independent Entity;

> b. I will not inform Michael R. Bloomberg or any agents of the Committee that I have solicited an individual or inform Michael R. Bloomberg of any contributions I raised for the Independent Entity;

> c. I will not accept information from the Independent Entity to use in fundraising that would otherwise violate this Policy.

5. If I am (or my company is) a contractor to the Committee, I will require all employees of my company who work on matters for the Committee to sign this Coordination Policy and abide by it. I will be responsible for maintaining signed copies for my employees (or I may return them to the Committee's counsel).

DocuSigned by:

*Kerry Billings*

0C70CA8CECB944A...

Name: Kerry Billings

1/13/2020

**App. 120**

# EXHIBIT I



# Delaware

### The First State

Page 1

 

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF*

*DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT*

*COPY OF THE CERTIFICATE OF INCORPORATION OF "MIKE BLOOMBERG*

*2020, INC.", FILED IN THIS OFFICE ON THE EIGHTH DAY OF*

*NOVEMBER, A.D. 2019, AT 5:43 O`CLOCK P.M.*

*A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE*

*NEW CASTLE COUNTY RECORDER OF DEEDS.*



Jeffrey W. Bullock, Secretary of State

7695013  8100
SR# 20198003279

Authentication: 203970736
Date: 11-08-19

You may verify this certificate online at corp.delaware.gov/authver.shtml

App. 122

State of Delaware
Secretary of State
Division of Corporations
Delivered  05:43 PM 11/08/2019
FILED  05:43 PM 11/08/2019
SR 20198003279 - File Number 7695013

## CERTIFICATE OF INCORPORATION
## OF
## MIKE BLOOMBERG 2020, INC.

FIRST:  The name of the corporation (the "Corporation") is: Mike Bloomberg 2020, Inc.

SECOND:  The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, in the County of New Castle.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

THIRD:  The Corporation is organized for the following purposes:

To solicit and accept contributions, to make expenditures and disbursements, and to engage in any activities related to federal elections or issues of public importance that are authorized by and are consistent with Section 527 of the Internal Revenue Code of 1986, as amended, and other applicable law.

FOURTH:  The Corporation shall be a nonprofit corporation and shall have no authority to issue capital stock.

FIFTH:  The conditions of membership in the Corporation shall be as set forth in the Bylaws of the Corporation.

SIXTH: The Corporation shall have perpetual existence, but may be dissolved at any time by action of a majority of the Board of Directors then in office, pursuant to the requirements of the Delaware General Corporation Law, as the same exists or may hereafter be amended.  In the event of such dissolution, all surplus funds of the Corporation shall be distributed in a manner consistent with Section 527 of the Internal Revenue Code, including, at the discretion of a majority of the Board, to an organization which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. Surplus funds may also be refunded to any contributors to the Corporation on a pro-rata basis.

SEVENTH:  A director of the Corporation shall not be personally liable to the Corporation or its members for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law, as the same exists or may hereafter be amended.  Any repeal or modification of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation existing hereunder with respect to any act or omission occurring prior to such repeal or modification.

EIGHTH:  In furtherance and not in limitation of the powers conferred by law, subject to any limitations contained in the Corporation's Bylaws, the Corporation's Board of Directors is authorized to make, repeal, alter, amend or rescind the Bylaws.

NINTH:  The name and mailing address of the incorporator are as follows:

> Meredith McCoy
> Venable LLP
> 600 Massachusetts Avenue, NW
> Washington, DC 20001

I, the Undersigned, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 8th day of November, 2019.

Meredith McCoy, Incorporator

# EXHIBIT J

# FEC FORM 1

# STATEMENT OF ORGANIZATION

Office Use Only

1. NAME OF COMMITTEE (in full)    ☐ (Check if name is changed)    Example: If typing, type over the lines.

`12FE4M5`

## Mike Bloomberg 2020, Inc.

ADDRESS (number and street)    909 Third Avenue

☐ ◄ (Check if address is changed)    c/o Geller & Company

New York    NY    10022    –

CITY ▲    STATE ▲    ZIP CODE ▲

COMMITTEE'S E-MAIL ADDRESS

☐ ◄ (Check if address is changed)    compliance@mikebloomberg.com

Optional Second E-Mail Address

COMMITTEE'S WEB PAGE ADDRESS (URL)

☐ ◄ (Check if address is changed)    www.mikebloomberg.com

2. DATE    M M `11` / D D `21` / Y Y Y Y `2019`

3. FEC IDENTIFICATION NUMBER ▶    C `C00728154`

4. IS THIS STATEMENT    ☒ NEW (N)    **OR**    ☐ AMENDED (A)

I certify that I have examined this Statement and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer    Horowitz, Hayden, , ,

Signature of Treasurer    *Horowitz, Hayden, , ,*    *[Electronically Filed]*    Date    M M `11` / D D `21` / Y Y Y Y `2019`

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Statement to the penalties of 2 U.S.C. §437g.
ANY CHANGE IN INFORMATION SHOULD BE REPORTED WITHIN 10 DAYS.

Office Use Only

**For further information contact:**
Federal Election Commission
Toll Free 800-424-9530
Local 202-694-1100

**FEC FORM 1**
(Revised 06/2012)

**App. 126**

5.  TYPE OF COMMITTEE

**Candidate Committee:**

(a)   [✗]   This committee is a principal campaign committee. (Complete the candidate information below.)

(b)   [ ]   This committee is an authorized committee, and is NOT a principal campaign committee. (Complete the candidate information below.)

Name of Candidate        Bloomberg, Michael, R., ,

Candidate Party Affiliation   [ DEM ]   Office Sought:   [ ] House   [ ] Senate   [✗] President   State [ ]   District [ ]

(c)   [ ]   This committee supports/opposes only one candidate, and is NOT an authorized committee.

Name of Candidate   [ ]

**Party Committee:**

(d)   [ ]   This committee is a   [ ]   (National, State or subordinate) committee of the   [ ]   (Democratic, Republican, etc.) Party.

**Political Action Committee (PAC):**

(e)   [ ]   This committee is a separate segregated fund. (Identify connected organization on line 6.) Its connected organization is a:

  [ ] Corporation        [ ] Corporation w/o Capital Stock        [ ] Labor Organization

  [ ] Membership Organization   [ ] Trade Association          [ ] Cooperative

     [ ]   In addition, this committee is a Lobbyist/Registrant PAC.

(f)   [ ]   This committee supports/opposes more than one Federal candidate, and is NOT a separate segregated fund or party committee. (i.e., nonconnected committee)

     [ ]   In addition, this committee is a Lobbyist/Registrant PAC.

     [ ]   In addition, this committee is a Leadership PAC. (Identify sponsor on line 6.)

**Joint Fundraising Representative:**

(g)   [ ]   This committee collects contributions, pays fundraising expenses and disburses net proceeds for two or more political committees/organizations, at least one of which is an authorized committee of a federal candidate.

(h)   [ ]   This committee collects contributions, pays fundraising expenses and disburses net proceeds for two or more political committees/organizations, none of which is an authorized committee of a federal candidate.

Committees Participating in Joint Fundraiser

1.   [ ]   FEC ID number   C [ ]

2.   [ ]   FEC ID number   C [ ]

3.   [ ]   FEC ID number   C [ ]

4.   [ ]   FEC ID number   C [ ]

Write or Type Committee Name

# Mike Bloomberg 2020, Inc.

6.    Name of Any Connected Organization, Affiliated Committee, Joint Fundraising Representative, or Leadership PAC Sponsor

NONE

Mailing Address

CITY                                        STATE                ZIP CODE

Relationship:    ☐ Connected Organization    ☐ Affiliated Committee    ☐ Joint Fundraising Representative    ☐ Leadership PAC Sponsor

---

7.    **Custodian of Records:** Identify by name, address (phone number -- optional) and position of the person in possession of committee books and records.

Full Name          Horowitz, Hayden, , ,

Mailing Address    909 Third Avenue

                   c/o Geller & Company

                   New York                                NY        10022

Title or Position                          CITY                STATE              ZIP CODE

Treasurer                                  Telephone number    212 – 205 – 7446

---

8.    **Treasurer:** List the name and address (phone number -- optional) of the treasurer of the committee; and the name and address of any designated agent (e.g., assistant treasurer).

Full Name          Horowitz, Hayden, , ,
of Treasurer

Mailing Address    909 Third Avenue

                   c/o Geller & Company

                   New York                                NY        10022
                                          CITY                STATE              ZIP CODE

Title or Position
Treasurer                                  Telephone number    212 – 205 – 7446

**App. 128**

FEC **Form 1** (Revised 02/2009)                                                                                          Page **4**

Full Name of
Designated
Agent

Mailing Address

| | | | | | | | | | | | | | | | | | | | | | | | | | |
CITY                                              STATE                    ZIP CODE

Title or Position

Telephone number

9.  **Banks or Other Depositories:** List all banks or other depositories in which the committee deposits funds, holds accounts, rents safety deposit boxes or maintains funds.

Name of Bank, Depository, etc.

Bank of America

Mailing Address

114 West 47th Street

New York                                          NY          10036
CITY                                              STATE                    ZIP CODE

Name of Bank, Depository, etc.

Mailing Address

CITY                                              STATE                    ZIP CODE

# EXHIBIT K

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONNA WOOD, CAELAN DOHERTY, MAX GOLDSTEIN, BRIDGET LOGAN, JAMES KYLE NEWMAN, ZIA ORAM, ALAN ROBINSON, ALEXANDRA MARIE WHEATLEY-DIAZ, individually and on behalf all others similarly situated, and CHERYL BALDWIN, JONATHAN BARRIO, DESMOND BATTS, GARRETT BECKENBAUGH, COCHIESE BOWERS, MILES CEPLECHA, ROBIN CEPPOS, MELINDA CIRILO, JANE CONRAD, ROBERT CORDOVA, JR., CHRISTINE DOCZY, RACHEL DOUGLAS, THERESA EDWARDS, ELIZA FINK, JASON FINKELSTEIN, ILSE MENDEZ FRAGA, JOSH FREDRICKSON, MARIA GONZALEZ, NATHANIEL ROBERT GROH, BRANDI HARRIS, PETER KAMARA, MACK KENNEDY, MADISON OLIVER MAYS, PATRICK MCHUGH, FRIDA MICHELLE NARANJO, PAUL MONTEROSSO, REY MURPHY, JOSEPH NESTOR, LUKE NICHOLAS, JOSEPHINE OLINGER, ALEC SILVESTER, DANIEL SMITH, CHRIS SOTH, AUDRA TELLEZ, CARLOS TORRES, ELLIOTT TRICOTTI, GLORIA TYLER, LAKISHA WATSON-MOORE, JESSE WEINBERG, CLEM WRIGHT, ANOOSH YARAGHCHIAN, and JESUS ZAMORA, individually, <br><br> Plaintiffs, <br><br> v. <br><br> MIKE BLOOMBERG 2020, INC., <br><br> Defendant. | **No. 20 Civ. 2489 (LTS) (GWG)** <br><br> **FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

Plaintiffs Donna Wood, Caelan Doherty, Max Goldstein, Bridget Logan, James Kyle Newman, Zia Oram, Alan Robinson, Alexandra Marie Wheatley-Diaz (collectively, "Representative Plaintiffs"), individually and on behalf of all others similarly situated, and Cheryl Baldwin, Jonathan Barrio, Desmond Batts, Garrett Beckenbaugh, Cochiese Bowers, Miles Ceplecha, Robin Ceppos, Melinda Cirilo, Jane Conrad, Robert Cordova Jr., Christine Doczy, Rachel Douglas, Theresa Edwards, Eliza Fink, Jason Finkelstein, Ilse Mendez Fraga, Josh Fredrickson, Maria Gonzalez, Nathaniel Robert Groh, Brandi Harris, Peter Kamara, Mack Kennedy, Madison Oliver Mays, Patrick McHugh, Paul Monterosso, Rey Murphy, Frida Michelle Naranjo, Joseph Nestor, Luke Nicholas, Josephine Olinger, Alec Silvester, Daniel Smith, Chris Soth, Audra Tellez, Carlos Torres, Elliott Tricotti, Gloria Tyler, Lakisha Watson-Moore, Jesse Weinberg, Clem Wright, Anoosh Yaraghchian, and Jesus Zamora, individually (collectively, with Representative Plaintiffs, "Plaintiffs"), by their attorneys, Shavitz Law Group, P.A. and Outten & Golden LLP, upon personal knowledge as to themselves and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      On November 24, 2019, Mike Bloomberg announced his candidacy for President of the United States in the 2020 Presidential Election.

2.      In or around January 2020, Mike Bloomberg 2020, Inc. (the "Campaign") began hiring Campaign Field Organizers ("FOs")[1] and other Campaign employees, including but not

---

[1]      FOs also include similar job titles, including but not limited to, State Directors of Outreach to the LGBTQ Community and State Directors of Outreach to the Latino Community.

limited to Regional Organizing Directors and Deputy Organizing Directors (collectively, with FOs, "Field Employees") throughout the United States.

3.       Because Mr. Bloomberg was late to enter the election, to attract employees to the FO and other Field Employee positions, the Campaign unambiguously promised to employ them, pay wages, and provide healthcare and other benefits through November 2020.

4.       Reasonably relying on the Campaign's promises, Plaintiffs, other FOs, and other Field Employees resigned from their then-current employment, relocated, and/or forfeited other opportunities to work for the Campaign.

5.       Once employed, the Campaign made additional promises to Plaintiffs, other FOs, and other Field Employees that the Campaign would provide employment, pay, and health insurance, and other benefits through November 2020.

6.       For example, the Campaign promised to provide benefits, including full, employer-paid healthcare benefits to Plaintiffs, other FOs, and other Field Employees, and to their spouses, partners, and children.

7.       Additionally, the Campaign promised Plaintiffs, other FOs, and other Field Employees that, even if Mr. Bloomberg did not win the Democratic nomination, the Campaign would continue to employ, pay, and provide benefits to Plaintiffs, other FOs, and other Field Employees through November 2020 to support the Democratic nominee.

8.       Reasonably relying on these promises, Plaintiffs, other FOs, and other Field Employees forewent pursuing other employment opportunities and leaving the Campaign.

9.       Plaintiffs, other FOs, and other Field Employees forewent such opportunities, even after Mr. Bloomberg dropped out of the 2020 presidential race on March 4, 2020.

10.     In contravention of its promise of continued employment through November 2020, and in the face of a worldwide pandemic and likely global recession, beginning on or about March 9, 2020, the Campaign terminated Plaintiffs, as well as the vast majority of its other FOs and other Field Employees.

11.     The Campaign's termination of Plaintiffs, other FOs, and other Field Employees deprived them of promised income, and healthcare benefits, and other benefits, leaving them without a source of income and their families potentially uninsured in the face of a global pandemic.

12.     The Campaign repeatedly made promises and false statements to Plaintiffs, other FOs, and other Field Employees about the material fact that the Campaign would provide employment, pay and healthcare and other benefits to Plaintiffs, other FOs and other Field Employees through November 2020.

13.     Upon information and belief, the Campaign fraudulently made these promises and false statements knowing – and/or with reckless disregard as to whether they were true – that they would imminently layoff Plaintiffs, other FOs, and other Field Employees.

14.     Upon information and belief, the Campaign made these false statements in order to induce Plaintiffs, other FOs, and other Field Employees to accept positions on the Campaign and continue to work on the Campaign until the Campaign decided to terminate them.

15.     Plaintiffs, other FOs, and other Field Employees were injured by relying on the Campaign's promises of employment.

16.     Both before and after the Campaign hired Plaintiffs, other FOs, and other Field Employees, the Campaign reasonably expected its unambiguous promise of employment, pay,

**App. 134**

and healthcare and other benefits to induce Plaintiffs, other FOs, and other Field Employees to work for the Campaign and forgo other opportunities.

17.     Plaintiffs, other FOs, and other Field Employees reasonably relied on these promises and worked for the Campaign, forgoing other opportunities to their detriment.

18.     Injustice can only be avoided by requiring the Campaign to comply with its promises.

19.     As part of Bloomberg's nationwide Campaign efforts, Plaintiffs' and other FOs' primary duties included calling prospective voters to promote Mr. Bloomberg's candidacy for president, door-to-door canvassing, and recruiting volunteers.

20.     On at least a weekly basis, the Campaign required Plaintiffs and other FOs nationwide to participate in all-state conference calls led by its New York City Headquarters office.

21.     Campaign leaders from the New York City Headquarters office frequently visited field offices.

22.     Plaintiffs and other FOs regularly worked in excess of 40 hours per workweek.

23.     The Campaign uniformly classified Plaintiffs' and other FOs' as exempt from overtime pay and did not pay Plaintiffs and other FOs overtime wages.

24.     The Campaign paid Plaintiffs and other FOs approximately $6,000 a month.

25.     The primary duties of Plaintiffs and other FOs do not fall under any of the exemptions to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA") or the wage and hour laws of New York, California, Michigan, Wisconsin, Illinois, Minnesota, and North Carolina.

26.     This lawsuit seeks to recover overtime compensation for Plaintiffs and similarly

App. 135

situated individuals who have worked as exempt-classified FOs for the Campaign between November 24, 2019 and the present ("Relevant Period").

27.     Representative Plaintiffs bring this action on behalf of themselves and similarly situated current and former employees who elect to opt in to this action pursuant to the FLSA, specifically, the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage-and-hour provisions of the FLSA by the Campaign that have deprived Plaintiffs and others similarly situated of their lawfully earned wages.

28.     Plaintiff Caelan Doherty ("Plaintiff Doherty" or "the Illinois Plaintiff") also brings this action on behalf of herself and similarly situated FOs in Illinois pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") to remedy violations of the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and its implementing regulations.

29.     Plaintiff Max Goldstein ("Plaintiff Goldstein" or "the New York Plaintiff") also brings this action on behalf of himself and similarly situated FOs in New York pursuant to Rule 23 to remedy violations of the New York Labor Law ("NYLL") Article 6, §§ 190 *et seq.*, and Article 19, §§ 650 *et seq.*, and supporting New York State Department of Labor regulations.

30.     Plaintiff Bridget Logan ("Plaintiff Logan" or "the Minnesota Plaintiff") also brings this action on behalf of herself and similarly situated FOs in Minnesota pursuant to Rule 23 to remedy violations of the Minnesota Fair Labor Standards Act ("MFLSA") §§ 177.23, 177.25, and Minn. R. 5200 *et seq.*

31.     Plaintiff James Kyle Newman ("Plaintiff Newman" or "the North Carolina Plaintiff") also brings this action on behalf of himself and similarly situated FOs in North Carolina pursuant to Rule 23 to remedy violations of the North Carolina Wage and Hour Act,

N.C. Gen. Stat. Ann. § 95-25.1 *et seq.* ("NCWHA").  Plaintiff Newman brings the NCWHA

claims in the alternative to the FLSA claims.

32.     Plaintiff Zia Oram ("Plaintiff Oram" or "the Michigan Plaintiff") also brings this

action on behalf of himself and similarly situated FOs in Michigan pursuant to Rule 23 to

remedy violations of the Michigan Workforce Opportunity Wage Act ("MWOWA"), Mich.

Comp. Laws § 408.414a *et seq.*, and Mich. Comp. Laws § 408.412 *et seq.*  Plaintiff Oram brings

the MWOWA claims in the alternative to the FLSA claims.

33.     Plaintiff Alan Robinson ("Plaintiff Robinson" or "the Wisconsin Plaintiff") also

brings this action on behalf of himself and similarly situated FOs in Wisconsin pursuant to Rule

23 to remedy violations of the Wisconsin Statute §§ 103 and 104 *et seq.*, and Wis. Admin. Code

§ DWD 274.03.

34.     Plaintiff Alexandra Marie Wheatley-Diaz ("Plaintiff Wheatley-Diaz" or "the

California Plaintiff") also brings this action on behalf of herself and similarly situated FOs in

California pursuant to Rule 23 to remedy violations of the California Labor Code, Cal. Lab.

Code §§ 204, 210, 218.5, 226, 226.7, 510, 512, 1174, 1174.5, 1194, 1198, & 2802, California's

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and California Wage Order

Nos. 4-2001 & 7-2001.

## THE PARTIES

*Representative Plaintiffs*

### Plaintiff Donna Wood

35.     Plaintiff Donna Wood is a resident of North Miami Beach, Florida.  Plaintiff

Wood worked as a FO for the Campaign in the Miami, Florida office from approximately

January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's

**App. 137**

promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff

Wood left her job as a courier, which she had held for three years.  After Plaintiff Wood was

employed by the campaign, Plaintiff Wood relied on the Campaign's continued and repeated

promise of employment and/or guaranteed salary and benefits through November 2020 and did

not pursue different employment.

36.     While employed by the Campaign, Plaintiff Wood regularly worked

approximately 70 hours a week, including the week preceding March 3, 2020, which was Super

Tuesday.  The Campaign paid Plaintiff Wood $6,000 a month and she received health insurance

and other employee benefits.  Plaintiff Wood is a covered employee within the meaning of the

FLSA.

**Plaintiff Caelan Doherty**

37.     Plaintiff Caelan Doherty is a resident of Burlington, Massachusetts.  Plaintiff

Doherty worked as an FO for the Campaign in the Chicago Northside office in Illinois from

approximately January 2020 until March 2020, when the Campaign terminated her.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Doherty planned to take leave from college for at least a semester.

After Plaintiff Doherty was employed by the Campaign, Plaintiff Doherty relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.

38.     While employed by the Campaign, Plaintiff Doherty regularly worked

approximately 70 hours a week, including the week preceding March 3, 2020, which was Super

Tuesday.  The Campaign paid Plaintiff Doherty $6,000 a month and she received health

insurance and other employee benefits.  Plaintiff Doherty is a covered employee within the meaning of the FLSA and Illinois state law.

**Plaintiff Max Goldstein**

39.     Plaintiff Max Goldstein is a resident of New York, New York.  Plaintiff Goldstein worked as an FO for the Campaign in the New York, New York office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Goldstein left his job at Royal Media, which he had held for two years.  After Plaintiff Goldstein was employed by the Campaign, Plaintiff Goldstein relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

40.     While employed by the Campaign, Plaintiff Goldstein regularly worked approximately 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Goldstein $6,000 a month and he received health insurance and other employee benefits.  When the Campaign hired Plaintiff Goldstein, it failed to provide him with a written notice that included his hourly rate or rates of pay and overtime rate of rates of pay, in violation of NYLL.  The Campaign also failed to provide Plaintiff Goldstein with wage statements with his overtime rate.  At his time of hire, Plaintiff Goldstein is a covered employee within the meaning of the FLSA and the NYLL.

**Plaintiff Bridget Logan**

41.     Plaintiff Bridget Logan is a resident of Plymouth, Minnesota.  Plaintiff Logan worked as a FO for the Campaign in the St. Anthony, Minnesota office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Logan her job with Minnetuka Title Company, which she had held for six years.

After Plaintiff Logan was employed by the Campaign, Plaintiff Logan relied on the Campaign's

continued and repeated promise of employment and/or guaranteed salary and benefits through

November 2020 and did not pursue different employment.  Plaintiff Logan relied on the

Campaign's continued promise of employment through November 2020 and did not pursue

different employment.

42.     While employed by the Campaign, Plaintiff Logan regularly worked

approximately 50 hours a week, including the week preceding March 3, 2020, which was Super

Tuesday.  The Campaign paid Plaintiff Logan $6,000 a month and she received health insurance

and other employee benefits.  Plaintiff Logan is a covered employee within the meaning of the

FLSA and Minnesota state law.

**Plaintiff James Kyle Newman**

43.     Plaintiff James Kyle Newman is a resident of Winston-Salem, North Carolina.

Plaintiff Newman worked as an FO for the Campaign in the Winston-Salem, North Carolina

office from approximately late January 2020 until March 2020, when the Campaign terminated

him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits

through November 2020, Plaintiff Newman turned down other potential employment

opportunities.  After Plaintiff Newman was employed by the Campaign, Plaintiff Newman relied

on the Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.

44.     While employed by the Campaign, Plaintiff Newman regularly worked

approximately 65 hours a week or more, including the week of February 24, 2020.  The

Campaign paid Plaintiff Newman $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Newman is a covered employee within the meaning of the FLSA and/or North Carolina state law.

**Plaintiff Zia Oram**

45.     Plaintiff Zia Oram is a resident of Farmington, Michigan.  Plaintiff Oram worked as a FO for the Campaign in the Oakland County, Michigan office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary through November 2020, Plaintiff Oram agreed to work for the Campaign over other job opportunities.  After Plaintiff Oram was employed by the Campaign, Plaintiff Oram relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary through November 2020 and did not pursue different employment.  Plaintiff Oram has a baby due in July 2020 and was relying on his continued employment with the Campaign to support his family.

46.     While employed by the Campaign, Plaintiff Oram regularly worked approximately 60 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Oram $6,000 a month which he needed to support him and his family.  Plaintiff Oram is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Alan Robinson**

47.     Plaintiff Alan Robinson is a resident of Madison, Wisconsin.  Plaintiff Robinson worked as a FO for the Campaign in the Madison, Wisconsin office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff

Robinson left his job at NORML Wisconsin.  After Plaintiff Robinson was employed by the Campaign, Plaintiff Robinson relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

48.      While employed by the Campaign, Plaintiff Robinson regularly worked approximately 60 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Robinson $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Robinson is a covered employee within the meaning of the FLSA and Wisconsin state law.

### Plaintiff Alexandra Marie Wheatley-Diaz

49.      Plaintiff Alexandra Marie Wheatley-Diaz is a resident of Manhattan Beach, California.  Plaintiff Wheatley-Diaz worked as a FO for the Campaign in the Los Angeles, California office from approximately January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Wheatley-Diaz reduced her hours at her job with an insurance firm by nearly half.  After Plaintiff Wheatley-Diaz was employed by the Campaign, Plaintiff Wheatley-Diaz relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

50.      While employed by the Campaign, Plaintiff Wheatley-Diaz regularly worked approximately 65 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  Plaintiff Wheatley-Diaz also routinely worked more than eight hours per day.  The Campaign paid Plaintiff Wheatley-Diaz $6,000 a month and she received health insurance and

other employee benefits.  The Campaign, however, did not timely pay Plaintiff Wheatley-Diaz –

although she started with the Campaign in mid-January, she did not receive her first paycheck

until mid-February.  Additionally, the Campaign did not list the number of hours that she worked

during a pay period on her wage statements.  The Campaign also failed to provide Plaintiff

Wheatley-Diaz with adequate meal or rest breaks and failed to reimburse her for all necessary

expenditures that she incurred in the discharge of her duties, including gas, routine car

maintenance, parking, and insurance.  Plaintiff Wheatley-Diaz is a covered employee within the

meaning of the FLSA and California state law.

***Individual Plaintiffs***

**Plaintiff Cheryl Baldwin**

51.     Plaintiff Cheryl Baldwin is a resident of Morrow, Georgia.  Plaintiff Baldwin

worked as an FO for the Campaign in the Tallahassee, Florida and Jacksonville, Florida offices

from approximately February 2020 until March 2020, when the Campaign terminated her.

Relying on the Campaign's promise of employment and/or guaranteed salary and benefits

through November 2020, Plaintiff Baldwin turned down another employment opportunity that

would have been closer to her home, leased her home in Georgia, moved to Florida, and

canceled her Medicare insurance benefits.  After Plaintiff Baldwin was employed by the

Campaign, Plaintiff Baldwin relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.

52.     While employed by the Campaign, Plaintiff Baldwin regularly worked

approximately over 80 hours a week, including the week of February 24, 2020.  The Campaign

paid Plaintiff Baldwin $6,000 a month and she received health insurance and other employee

benefits.  Plaintiff Baldwin is a covered employee within the meaning of the FLSA.

**Plaintiff Jonathan Barrio**

53.      Plaintiff Jonathan Barrio is a resident of Charlotte, North Carolina.  Plaintiff

Barrio worked as the Campaign's North Carolina Director for LGBTQ issues.  Plaintiff Barrio

worked out of the Charlotte, North Carolina office from approximately February 2020 until

March 2020, when the Campaign terminated him.  Plaintiff Barrio's job duties included: state-

wide outreach on LGBTQ issues such as meetings with stake holders and interfacing with

LGBTQ people throughout North Carolina.  He got his talking points on these issues from

Campaign headquarters in New York.  Plaintiff Barrio did not hire or fire any Field Employees

and did not supervise anyone employed by the Campaign.  Plaintiff Barrio performed all of his

job duties pursuant to instructions from the Campaign's headquarters.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Barrio left his job at Equality North Carolina, where he was a development

director.  After Plaintiff Barrio was employed by the Campaign, Plaintiff Barrio relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and turned down other job opportunities.

54.      While employed by the Campaign, Plaintiff Barrio regularly worked

approximately over 60 hours a week, including the week preceding March 3, 2020, which was

Super Tuesday.  The Campaign paid Plaintiff Barrio $10,000 a month and he received health

insurance and other employee benefits.  Plaintiff Barrio is a covered employee within the meaning

of the FLSA and/or North Carolina state law.

- 14 -

App. 144

**Plaintiff Desmond Batts**

55.     Plaintiff Desmond Batts is a resident of Tampa, Florida.  Plaintiff Batts worked as a Regional Organizing Director for the Campaign in the Tampa, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Batts resigned from another job.  After Plaintiff Batts was employed by the Campaign, Plaintiff Batts relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Batts performed all of his job duties pursuant to instructions and direction from the Campaign's headquarters.

56.     While employed by the Campaign, Plaintiff Batts regularly worked approximately 70 hours a week or more, including during the week of February 25, 2020.  The Campaign paid Plaintiff Batts $8,000 a month and he received health insurance and other employee benefits. Plaintiff Batts is a covered employee within the meaning of the FLSA.

**Plaintiff Garrett Beckenbaugh**

57.     Plaintiff Garrett Beckenbaugh is a resident of Orlando, Florida.  Plaintiff Beckenbaugh worked as an FO for the Campaign in the Orlando, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Beckenbaugh left his employment, which he would not have done without the promise of compensation through November.  After Plaintiff Beckenbaugh was employed by the Campaign, Plaintiff Beckenbaugh relied on the Campaign's continued and

repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

58.    While employed by the Campaign, Plaintiff Beckenbaugh regularly worked approximately 70-80 hours a week, including working approximately 70 hours the week of February 24, 2020.  The Campaign paid Plaintiff Beckenbaugh $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Beckenbaugh is a covered employee within the meaning of the FLSA.

**Plaintiff Cochiese Bowers**

59.    Plaintiff Cochiese Bowers is a resident of Atlanta, Georgia.  Plaintiff Bowers worked as an FO for the Campaign in Atlanta, Georgia office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Bowers gave up his job at a non-profit working for schools.  After Plaintiff Bowers was employed by the Campaign, Plaintiff Bowers relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

60.    While employed by the Campaign, Plaintiff Bowers regularly worked approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Bowers $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Bowers is a covered employee within the meaning of the FLSA.

**Plaintiff Miles Ceplecha**

61.    Plaintiff Miles Ceplecha is a resident of St. Paul, Minnesota.  Plaintiff Ceplecha worked as an FO for the Campaign in the St. Anthony, Minnesota office from approximately

January 13, 2020 to March 13, 2020, when the Campaign terminated him.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Ceplecha stopped taking on contract work and did not move forward with other

job opportunities when he decided to join the Campaign. After Plaintiff Ceplecha was employed

by the Campaign, Plaintiff Ceplecha relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.

      62.     While employed by the Campaign, Plaintiff Ceplecha regularly worked

approximately 60 to 80 hours a week.  During the first three weeks of his employment, he

worked about 5 days a week and 12-hour days.  After that, he worked seven days per week and

between 70 to 80 hours a week.  During the week of February 3, 2020, Plaintiff Ceplecha worked

seven days and about 80 hours.  The Campaign paid Plaintiff Ceplecha $6,000 a month and he

received health insurance and other employee benefits.  Plaintiff Ceplecha is a covered employee

within the meaning of the FLSA and Minnesota state law.

**Plaintiff Robin Ceppos**

      63.     Plaintiff Robin Ceppos is a resident of Los Angeles, California.  Plaintiff Ceppos

worked as an FO for the Campaign in the downtown Los Angeles office and, later, in the

Pasadena office from approximately late January 2020 until March 2020, when the Campaign

terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary

and benefits through November 2020, Plaintiff Ceppos left her employment as a public relations

representative in Washington, D.C. and moved across the country to California.  After Plaintiff

Ceppos was employed by the Campaign, Plaintiff Ceppos relied on the Campaign's continued

- 17 -

and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

64.     While employed by the Campaign, Plaintiff Ceppos regularly worked approximately 65 hours a week or more, including the week of February 24, 2020.  Plaintiff Ceppos also routinely worked more than eight hours per day.  The Campaign did not, however, list the number of hours that she worked during a pay period on her wage statements.  The Campaign did not provide Plaintiff Ceppos with adequate meal or rest breaks and did not reimburse her for all necessary expenditures that she incurred in the discharge of her duties, such as travel expenses.  The Campaign paid Plaintiff Ceppos $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Ceppos is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Melinda Cirilo**

65.     Plaintiff Melinda Cirilo is a resident of San Antonio, Texas.  Plaintiff Cirilo worked as an FO for the Campaign in the San Antonio, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Cirilo left her employment where she was a temporary employee and gave up the opportunity to become a permanent employee.  After Plaintiff Cirilo was employed by the Campaign, Plaintiff Cirilo relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

66.     While employed by the Campaign, Plaintiff Cirilo regularly worked approximately about 80 hours a week, including the week of February 17, 2020.  The Campaign

paid Plaintiff Cirilo $6,000 a month and she received health insurance and other employee

benefits.  Plaintiff Cirilo is a covered employee within the meaning of the FLSA.

**Plaintiff Jane Conrad**

67.     Plaintiff Jane Conrad is a resident of Richmond, Minnesota.  Plaintiff Conrad

worked as a Regional Organizing Director for the Campaign in the St. Paul, Minnesota office

from approximately February 2020 until March 2020, when the Campaign terminated her.

Relying on the Campaign's promise of employment and/or guaranteed salary and benefits

through November 2020, Plaintiff Conrad took a leave of absence from her job at a union until

the end of 2020.  After Plaintiff Conrad was employed by the Campaign, Plaintiff Conrad relied

on the Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.  Plaintiff Conrad

performed all of her job duties pursuant to instructions from the Campaign's headquarters.

68.     The Campaign paid Plaintiff Conrad $8,000 a month and she received health

insurance and other employee benefits.

**Plaintiff Robert Cordova, Jr.**

69.     Plaintiff Robert Cordova, Jr. is a resident of Tampa, Florida.  Plaintiff Cordova

worked as a FO for the Campaign in the Tampa, Florida office from approximately January 2020

until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of

employment and/or guaranteed salary and benefits through November 2020, Plaintiff Cordova

left his employment.  After Plaintiff Cordova was employed by the Campaign, Plaintiff Cordova

relied on the Campaign's continued and repeated promise of employment and/or guaranteed

salary and benefits through November 2020 and did not pursue different employment.

70.     While employed by the Campaign, Plaintiff Cordova regularly worked approximately 84 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Cordova $6,000 a month and he received health insurance and other employee benefits. Plaintiff Cordova is a covered employee within the meaning of the FLSA.

**Plaintiff Christine Doczy**

71.     Plaintiff Christine Doczy is a resident of Venice, Florida.  Plaintiff Doczy worked as an FO for the Campaign in the Sarasota, Florida office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Doczy turned down several other employment opportunities.  After Plaintiff Doczy was employed by the Campaign, Plaintiff Doczy relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

72.     While employed by the Campaign, Plaintiff Doczy regularly worked approximately about 70 hours a week, including the week of February 25, 2020.  The Campaign paid Plaintiff Doczy $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Doczy is a covered employee within the meaning of the FLSA.

**Plaintiff Rachel Douglas**

73.     Plaintiff Rachel Douglas is a resident of Los Angeles, California.  Plaintiff Douglas worked as an FO for the Campaign in the Downtown Los Angeles office and, later, the Pasadena, California office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Douglas stopped providing

- 20 -

full-time care for her disabled son and hired additional help to provide for his care.  After

Plaintiff Douglas was employed by the Campaign, Plaintiff Douglas relied on the Campaign's

continued and repeated promise of employment and/or guaranteed salary and benefits through

November 2020 and did not pursue different employment.

74.     While employed by the Campaign, Plaintiff Douglas regularly worked

approximately about 70 hours a week, including the week of February 24, 2020.  Plaintiff

Douglas also routinely worked more than eight hours per day.  The Campaign did not, however,

list the number of hours that she worked during a pay period on her wage statements.  The

Campaign did not provide Plaintiff Douglas with adequate meal or rest breaks and did not

reimburse her for all necessary expenditures that she incurred in the discharge of her duties, such

as travel expenses.  The Campaign paid Plaintiff Douglas $6,000 a month and she received

health insurance and other employee benefits.  Plaintiff Douglas is a covered employee within the

meaning of the FLSA and California state law.

**Plaintiff Theresa Edwards**

75.     Plaintiff Theresa Edwards is a resident of Cedar Park, Texas.  Plaintiff Edwards

worked as an FO for the Campaign in the Boca Raton, Florida office from approximately

February 2020 until March 2020, when the Campaign terminated her.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Edwards left her employment.  After Plaintiff Edwards was employed by the

Campaign, Plaintiff Edwards relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

76.     While employed by the Campaign, Plaintiff Edwards regularly worked approximately about 50 to 60 hours a week, including 55 hours the week of March 2, 2020.  The Campaign paid Plaintiff Edwards $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Edwards is a covered employee within the meaning of the FLSA.

**Plaintiff Eliza Fink**

77.     Plaintiff Eliza Fink is a resident of West Hartford, Connecticut.  Plaintiff Fink worked as an FO for the Campaign in the Milford, Connecticut office from approximately February 17, 2020 to March 9, 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fink left her employment and decided to join the Campaign. After Plaintiff Fink was employed by the Campaign, Plaintiff Fink relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

78.     While employed by the Campaign, Plaintiff Fink regularly worked approximately 65 to 70 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Fink $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Fink is a covered employee within the meaning of the FLSA.

**Plaintiff Jason Finkelstein**

79.     Plaintiff Jason Finkelstein is a resident of Aventura, Florida.  Plaintiff Finkelstein worked as an FO for the Campaign in the Miami North Dade office approximately from January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's

promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff

Finkelstein quit his job and turned down two other employment opportunities.  After Plaintiff

Finkelstein was employed by the Campaign, Plaintiff Finkelstein relied on the Campaign's

continued and repeated promise of employment and/or guaranteed salary and benefits through

November 2020 and did not pursue different employment.

80.      While employed by the Campaign, Plaintiff Finkelstein regularly worked

approximately over 70 hours a week, including working approximately 70 hours the week of

February 24, 2020.  The Campaign paid Plaintiff Finkelstein $6,000 a month and he received

health insurance and other employee benefits.  Plaintiff Finkelstein is a covered employee within

the meaning of the FLSA.

**Plaintiff Ilse Mendez Fraga**

81.      Plaintiff Ilse Mendez Fraga is a resident of Laredo, Texas.  Plaintiff Fraga worked

as an FO for the Campaign in the Laredo, Texas office from approximately February 2020 until

March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of

employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fraga left

her employment at the local school district.  After Plaintiff Fraga was employed by the

Campaign, Plaintiff Fraga relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.

82.      While employed by the Campaign, Plaintiff Fraga regularly worked

approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign

paid Plaintiff Fraga $6,000 a month and she received health insurance and other employee

benefits.  Plaintiff Fraga is a covered employee within the meaning of the FLSA.

- 23 -

**Plaintiff Josh Fredrickson**

83.     Plaintiff Josh Fredrickson is a resident of Chicago, Illinois.  Plaintiff Fredrickson worked as a Regional Organizing Director for the Campaign in the Chicago, Illinois office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fredrickson left a job on a state senate campaign and lost prospective employment from that race.  After Plaintiff Fredrickson was employed by the Campaign, Plaintiff Fredrickson relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Frederickson performed all of his job duties pursuant to instructions from the Campaign's headquarters.

84.     The Campaign paid Plaintiff Fredrickson $8,000 a month and he received health insurance and other employee benefits.

**Plaintiff Maria Gonzalez**

85.     Plaintiff Maria Gonzalez is a resident of Hollywood, Florida.  Plaintiff Gonzalez worked as an FO for the Campaign in the Gainesville, Florida office starting on approximately January 23, 2020, and was then promoted to a District Organizer position, which she held from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Gonzalez resigned from her prior employment.  After Plaintiff Gonzalez was employed by the Campaign, Plaintiff Gonzalez relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

- 24 -

86.     While employed by the Campaign as an FO, Plaintiff Gonzalez regularly worked approximately over 70 hours a week, including 70 hours the week of January 27, 2020.  The Campaign paid Plaintiff Gonzalez $6,000 a month for the FO position and $8,000 a month for the District Organizer position and she received health insurance and other employee benefits. Plaintiff Gonzalez is a covered employee within the meaning of the FLSA.

**Plaintiff Nathaniel Robert Groh**

87.     Plaintiff Nathaniel Robert Groh is a resident of Palatine, Illinois.  Plaintiff Groh worked as a Regional Organizing Director for the Campaign in the Rockford, Illinois office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Groh left a job with State Representative Mark Walker.  After Plaintiff Groh was employed by the Campaign, Plaintiff Groh relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Groh performed all of his job duties pursuant to instructions from the Campaign's headquarters.

88.     The Campaign paid Plaintiff Groh $8,000 a month and he received health insurance and other employee benefits.

**Plaintiff Brandi Harris**

89.     Plaintiff Brandi Harris is a resident of Houston, Texas.  Plaintiff Harris worked as an FO for the Campaign in the San Antonio, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Harris relocated from Houston to San Antonio.  After Plaintiff Harris was employed by the Campaign,

Plaintiff Harris relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

90.     While employed by the Campaign, Plaintiff Harris regularly worked approximately about 80 hours a week, including the week of February 25, 2020.  The Campaign paid Plaintiff Harris $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Harris is a covered employee within the meaning of the FLSA.

**Plaintiff Peter Kamara**

91.     Plaintiff Peter Kamara is a resident of Fridley, Minnesota.  Plaintiff Kamara worked as an FO for the Campaign in the Blaine, Minnesota office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Kamara resigned from his job.  After Plaintiff Kamara was employed by the Campaign, Plaintiff Kamara relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

92.     While employed by the Campaign, Plaintiff Kamara regularly worked approximately over 75 hours a week, including working approximately 75 hours the week of January 20, 2020.  The Campaign paid Plaintiff Kamara $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Kamara is a covered employee within the meaning of the FLSA and Minnesota state law.

- 26 -

**Plaintiff Mack Kennedy**

93.     Plaintiff Mack Kennedy is a resident of Gainesville, Florida.  Plaintiff Kennedy worked as an FO for the Campaign in the Gainesville, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Kennedy left his employment, which he had held for at least a year.  After Plaintiff Kennedy was employed by the Campaign, Plaintiff Kennedy relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

94.     While employed by the Campaign, Plaintiff Kennedy regularly worked approximately 50 to 55 hours a week, including the week of February 17, 2020.  The Campaign paid Plaintiff Kennedy $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Kennedy is a covered employee within the meaning of the FLSA.

**Plaintiff Madison Oliver Mays**

95.     Plaintiff Madison Oliver Mays is a resident of Huntersville, North Carolina. Plaintiff Mays worked as a FO for the Campaign in the Tampa, Florida office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Mays relocated from North Carolina to Florida.  After Plaintiff Mays was employed by the Campaign, Plaintiff Mays relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

96.     While employed by the Campaign, Plaintiff Mays regularly worked approximately 70 hours a week or more, including approximately 84 hours the week of February 24, 2020.  The Campaign paid Plaintiff Mays $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Mays is a covered employee within the meaning of the FLSA and/or North Carolina law.

**Plaintiff Patrick McHugh**

97.     Plaintiff Patrick McHugh is a resident of Lake Worth, Florida.  Plaintiff McHugh worked as an FO for the Campaign in the West Palm Beach and Boca Raton, Florida offices from approximately January 2020 until March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff McHugh turned down other job opportunities.  After Plaintiff McHugh was employed by the Campaign, Plaintiff McHugh relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

98.     While employed by the Campaign, Plaintiff McHugh regularly worked approximately over 70 hours a week, including working approximately 84 hours the week of February 18, 2020.  The Campaign paid Plaintiff McHugh $6,000 a month and he received health insurance and other employee benefits.  Plaintiff McHugh is a covered employee within the meaning of the FLSA.

**Plaintiff Paul Monterosso**

99.     Plaintiff Paul Monterosso is a resident of North Palm Beach, Florida.  Plaintiff Monterosso worked as a FO for the Campaign in the West Palm Beach, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Monterosso quit his job as an estimator with a contracting firm.  After

Plaintiff Monterosso was employed by the Campaign, Plaintiff Murphy relied on the Campaign's

continued and repeated promise of employment and/or guaranteed salary and benefits through

November 2020 and did not pursue different employment.

100.    While employed by the Campaign, Plaintiff Monterosso regularly worked

approximately 70 hours a week, including the week preceding March 3, 2020, which was Super

Tuesday.  The Campaign paid Plaintiff Monterosso $6,000 a month and he received health

insurance and other employee benefits.  Plaintiff Monterosso is a covered employee within the

meaning of the FLSA.

**Plaintiff Rey Murphy**

101.    Plaintiff Rey Murphy is a resident of Tucson, Arizona.  Plaintiff Murphy worked

as a FO for the Campaign in the Tucson, Arizona office from approximately January 2020 until

March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of

employment and/or guaranteed salary and benefits through November 2020, Plaintiff Murphy

forwent another job opportunity.  After Plaintiff Murphy was employed by the Campaign,

Plaintiff Murphy relied on the Campaign's continued and repeated promise of employment

and/or guaranteed salary and benefits through November 2020 and did not pursue different

employment.

102.    While employed by the Campaign, Plaintiff Murphy regularly worked

approximately 80 hours a week, including the week preceding March 3, 2020, which was Super

Tuesday.  The Campaign paid Plaintiff Murphy $6,000 a month and he received health insurance

and other employee benefits.  Plaintiff Murphy is a covered employee within the meaning of the FLSA.

**Plaintiff Frida Michelle Naranjo**

103.    Plaintiff Christine Naranjo is a resident of McAllen, Texas.  Plaintiff Naranjo worked as an FO for the Campaign in the McAllen, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Naranjo left her employment.  After Plaintiff Naranjo was employed by the Campaign, Plaintiff Naranjo relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

104.    While employed by the Campaign, Plaintiff Naranjo regularly worked approximately about 80 hours a week, including the week of February 25, 2020.  The Campaign paid Plaintiff Naranjo $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Naranjo is a covered employee within the meaning of the FLSA.

**Plaintiff Joseph Nestor**

105.    Plaintiff Joseph Nestor is a resident of Tampa, Florida.  Plaintiff Nestor worked as a Regional Organizing Director for the Campaign in the Florida from approximately January 20, 2020 until March 20, 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Nestor turned down jobs which he would handle for his consulting companies and also rejected interviews for other jobs.  After Plaintiff Nestor was employed by the Campaign, Plaintiff Nestor relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff

Nestor performed all of his job duties pursuant to instructions from the Campaign's headquarters.

106.    The Campaign paid Plaintiff Nestor $8,000 a month and he received health insurance and other employee benefits.

**Plaintiff Luke Nicholas**

107.    Plaintiff Luke Nicholas is a resident of Stafford, Virginia.  Plaintiff Nicholas worked as an FO for the Campaign in the Manassas, Virginia office from approximately the first week of February until approximately March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Nicholas left his undergraduate program and quit his job. After Plaintiff Nicholas was employed by the Campaign, Plaintiff Nicholas relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

108.    While employed by the Campaign, Plaintiff Nicholas regularly worked approximately over 60 hours a week, including working approximately 80 hours the week of February 24, 2020.  The Campaign paid Plaintiff Nicholas $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Nicholas is a covered employee within the meaning of the FLSA.

**Plaintiff Josephine Olinger**

109.    Plaintiff Josephine Olinger is a resident of Spring, Texas.  Plaintiff Olinger worked as an FO for the Campaign in the San Marcos, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Olinger turned down another employment opportunity that would have been

closer to her home and moved to San Marcos, Texas.  After Plaintiff Olinger was employed by the Campaign, Plaintiff Olinger relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

110.    While employed by the Campaign, Plaintiff Olinger regularly worked approximately 70-75 hours a week or more, including the week of February 24, 2020.  The Campaign paid Plaintiff Olinger $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Olinger is a covered employee within the meaning of the FLSA.

**Plaintiff Alec Silvester**

111.    Plaintiff Alec Silvester is a resident of Tallahassee, Florida.  Plaintiff Silvester worked as an FO for the Campaign in the Tallahassee, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Silvester delayed applying to and enrolling in law school.  After Plaintiff Silvester was employed by the Campaign, Plaintiff Silvester relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

While employed by the Campaign, Plaintiff Silvester regularly worked approximately over 70 hours a week, including during the week of February 4, 2020.  The Campaign paid Plaintiff Silvester $6,000 a month and he received health insurance and other employee benefits. Plaintiff Silvester is a covered employee within the meaning of the FLSA.

**App. 162**

**Plaintiff Daniel Smith**

112.     Plaintiff Daniel Smith is a resident of Detroit, Michigan.  Plaintiff Smith worked

as a FO for the Campaign in the Detroit, Michigan and Westland, Michigan offices from

approximately December 2019 until March 2020, when the Campaign terminated him.  Relying

on the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Smith forewent other opportunities.  After Plaintiff Smith was

employed by the Campaign, Plaintiff Smith relied on the Campaign's continued and repeated

promise of employment and/or guaranteed salary and benefits through November 2020 and did

not pursue different employment.

113.     While employed by the Campaign, Plaintiff Smith regularly worked

approximately 65 to 70 hours a week, including the week preceding March 3, 2020, which was

Super Tuesday.  The Campaign paid Plaintiff Smith $6,000 a month and he received health

insurance and other employee benefits.  Plaintiff Smith is a covered employee within the meaning

of the FLSA and/or Michigan state law.

**Plaintiff Chris Soth**

114.     Plaintiff Chris Soth is a resident of Minneapolis, Minnesota.  Plaintiff Soth

worked as an FO for the Campaign in the Blaine, Minnesota office from approximately January

2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's

promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff

Soth left his employment.  After Plaintiff Soth was employed by the Campaign, Plaintiff Soth

relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

115.   While employed by the Campaign, Plaintiff Soth regularly worked approximately 40 to 60 hours a week, if not more, including working approximately 90 hours the week of February 25, 2020.  The Campaign paid Plaintiff Soth $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Soth is a covered employee within the meaning of the FLSA and Minnesota state law.

**Plaintiff Audra Tellez**

116.   Plaintiff Audra Tellez is a resident of Clinton, Texas.  Plaintiff Tellez worked as an FO for the Campaign in the El Paso, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Tellez left her employment.  After Plaintiff Tellez was employed by the Campaign, Plaintiff Tellez relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

117.   While employed by the Campaign, Plaintiff Tellez regularly worked seven days a week and 12-hour days.  She worked approximately 75 to 80 hours a week, including the week of February 17, 2020.  The Campaign paid Plaintiff Tellez $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Tellez is a covered employee within the meaning of the FLSA.

**Plaintiff Carlos Torres**

118.   Plaintiff Carlos Torres is a resident of Fort Lauderdale, Florida.  Plaintiff Torres worked as an FO for the Campaign in the Miami, Florida office from approximately January

App. 164

2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Torres left his employment with a Medicare insurance agency.  After Plaintiff Torres was employed by the Campaign, Plaintiff Torres relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

119.     While employed by the Campaign, Plaintiff Torres regularly worked approximately over 75 hours a week, including during the week of February 25, 2020.  The Campaign paid Plaintiff Torres $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Torres is a covered employee within the meaning of the FLSA.

**Plaintiff Elliot Tricotti**

120.     Plaintiff Elliot Tricotti is a resident of Austin, Texas.  Plaintiff Tricotti worked as an FO for the Campaign in the Laredo and Austin, Texas offices from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Tricotti dropped clients from his consulting business.  After Plaintiff Tricotti was employed by the Campaign, Plaintiff Tricotti relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

121.     While employed by the Campaign, Plaintiff Tricotti regularly worked approximately over 80 hours a week, including working approximately 90 hours the week of February 18, 2020.  The Campaign paid Plaintiff Tricotti $6,000 a month and he received health

insurance and other employee benefits.  Plaintiff Tricotti is a covered employee within the meaning of the FLSA.

**Plaintiff Gloria Tyler**

122.    Plaintiff Gloria Tyler is a resident of Waller, Texas.  Plaintiff Tyler worked as an FO for the Campaign in the San Antonio, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Tyler relocated from California.  After Plaintiff Tyler was employed by the Campaign, Plaintiff Tyler relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

123.    While employed by the Campaign, Plaintiff Tyler regularly worked approximately about 80 hours a week, including the week of February 25, 2020.  The Campaign paid Plaintiff Tyler $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Tyler is a covered employee within the meaning of the FLSA.

**Plaintiff Lakisha Watson-Moore**

124.    Plaintiff Lakisha Watson-Moore is a resident of Horn Lake, Mississippi.  Plaintiff Watson-Moore worked as an FO for the Campaign in the Oakland County, Michigan office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Watson-Moore left her employment at the University of Memphis. After Plaintiff Watson-Moore was employed by the Campaign, Plaintiff Watson-Moore relied on

the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

125.     While employed by the Campaign, Plaintiff Watson-Moore regularly worked approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Watson-Moore $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Watson-Moore is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Jesse Weinberg**

126.     Plaintiff Jesse Weinberg is a resident of Chicago, Illinois.  Plaintiff Weinberg worked as an FO for the Campaign in the Rockford, Illinois office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Weinberg left his prior employment as a political strategist.  After Plaintiff Weinberg was employed by the Campaign, Plaintiff Weinberg relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

127.     While employed by the Campaign, Plaintiff Weinberg regularly worked approximately 60 to 70 hours or more a week, including working approximately 60 to 70 hours the week of February 25, 2020.  The Campaign paid Plaintiff Weinberg $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Weinberg is a covered employee within the meaning of the FLSA and Illinois state law.

**Plaintiff Clem Wright**

128.     Plaintiff Clem Wright is a resident of Memphis, Tennessee.  Plaintiff Wright
worked as a FO for the Campaign in the Detroit, Michigan office from approximately February
2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's
promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff
Wright left his IT job and relocated from Memphis, Tennessee to Detroit, Michigan.  After
Plaintiff Wright was employed by the Campaign, Plaintiff Wright relied on the Campaign's
continued and repeated promise of employment and/or guaranteed salary and benefits through
November 2020 and did not pursue different employment.

129.     While employed by the Campaign, Plaintiff Wright regularly worked seven days
per week and 12-hour shifts per day, including the week preceding March 3, 2020, which was
Super Tuesday, when he worked about 80 hours.  The Campaign paid Plaintiff Wright $6,000 a
month and he received health insurance and other employee benefits.  Plaintiff Wright is a
covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Anoosh Yaraghchian**

130.     Plaintiff Anoosh Yaraghchian is a resident of Rancho Palos Verdes, California.
Plaintiff Yaraghchian worked as an FO for the Campaign in the Los Angeles, California office
from approximately February 2020 until March 2020, when the Campaign terminated him.
Relying on the Campaign's promise of employment and/or guaranteed salary and benefits
through November 2020, Plaintiff Yaraghchian forewent other potential employment
opportunities.  After Plaintiff Yaraghchian was employed by the Campaign, Plaintiff
Yaraghchian relied on the Campaign's continued and repeated promise of employment and/or

App. 168

guaranteed salary and benefits through November 2020 and did not pursue different employment.

131.    While employed by the Campaign, Plaintiff Yaraghchian regularly worked approximately over 65 hours a week, including working approximately 70 hours the week of February 17, 2020.  Plaintiff Yaraghchian also routinely worked more than eight hours per day. The Campaign did not permit Plaintiff Yaraghchian to take any meal or rest breaks and did not reimburse him for all necessary expenditures that she incurred in the discharge of his duties, including travel expenses.  The Campaign paid Plaintiff Yaraghchian $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Yaraghchian is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Jesus Zamora**

132.    Plaintiff Jesus Zamora is a resident of Houston, Texas.  Plaintiff Zamora worked as an FO for the Campaign in the Houston office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Zamora left his prior employment.  After Plaintiff Zamora was employed by the Campaign, Plaintiff Zamora relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

133.    While employed by the Campaign, Plaintiff Zamora regularly worked approximately 70-80 hours a week, including working approximately 80 hours the week of February 25, 2020.  The Campaign paid Plaintiff Zamora $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Zamora is a covered employee within the meaning of the FLSA.

- 39 -

***Defendant Mike Bloomberg 2020, Inc.***

134.    The Campaign is a Delaware corporation with its headquarters in New York.  The
Campaign maintained offices nationwide, over which it had substantial control.

135.    The Campaign employed Plaintiffs and similarly situated employees in states
across the country within the meaning of the FLSA and the state laws of New York, California,
Michigan, Wisconsin, Illinois, Minnesota, and North Carolina.  The Campaign had substantial
control over Plaintiffs' working conditions and the unlawful policies and practices alleged herein.

136.    The Campaign is a covered employer within the meaning of the FLSA and the
state laws of New York, California, Michigan, Wisconsin, Illinois, Minnesota, and North
Carolina and, at all times relevant, employed and/or jointly employed Plaintiff and similarly
situated FOs.  Plaintiffs reported to the Campaign's worksites.

137.    At all times relevant, the Campaign maintained control, oversight and direction
over Plaintiffs and similarly situated FOs and other Field Employees, including timekeeping,
payroll, and other employment practices that applied to them.

138.    The Campaign applied the same employment policies, practices, and procedures
to all FOs and other Field Employees during the Relevant Period.

139.    The Campaign directly told Plaintiffs and other Campaign staffers that they would
be guaranteed employment and/or compensation and benefits through November 2020, and also
directed state Directors, Regional Organizing Directors, and others to communicate this
guarantee to FOs before and after hiring them.

- 40 -

## JURISDICTION AND VENUE

140.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1337, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C.

§ 1367.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C.

§ 1332.

141.    In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA

pursuant to 29 U.S.C. § 216(b).

142.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

143.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(a).  The Campaign is based in this District and transacts business here.  A substantial part

of the events or omissions giving rise to Plaintiffs' claims occurred in New York, New York.

## COLLECTIVE-WIDE FACTUAL ALLEGATIONS

144.    Representative Plaintiffs bring the First Cause of Action, pursuant to FLSA, 29

U.S.C. § 216(b), on behalf of themselves and all similarly situated persons who work or have

worked for the Campaign as FOs during the Relevant Period (the "FLSA Collective").

145.    All of the work that Representative Plaintiffs and the FLSA Collective have

performed has been assigned by the Campaign and/or the Campaign has been aware of all of the

work that Representative Plaintiffs and the FLSA Collective have performed.

146.    As part of its regular business practice, during the Relevant Period, the Campaign

engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Representative

Plaintiffs and the FLSA Collective.  This policy and pattern or practice includes, but is not limited to:

- 41 -

    a.      failing to pay Representative Plaintiffs and the members of the FLSA Collective overtime wages for hours that they worked in excess of 40 hours per workweek; and

    b.      misclassifying Representative Plaintiffs and the members of the FLSA Collective as exempt from the protections of the FLSA.

147.    The Campaign is aware or should have been aware that federal law required them to pay employees performing non-exempt duties, including Representative Plaintiffs and members of the FLSA Collective, an overtime premium for hours worked in excess of 40 per workweek.

148.    Representative Plaintiffs and the FLSA Collective all perform or performed the same or similar primary duty – making campaign telephone calls.

149.    Throughout their employment with the Campaign, Representative Plaintiffs and the members of the FLSA Collective consistently worked more than 40 hours per week.

150.    The Campaign failed to pay Representative Plaintiffs and the members of the FLSA Collective any overtime compensation for any of the hours worked over 40 in a workweek.

151.    Representative Plaintiffs and the FLSA Collective's primary duty was not management but rather non-exempt job duties such as making phone calls nationwide to potential voters to promote Mr. Bloomberg's candidacy for President of the United States and to recruit volunteers to aid in phone banking and canvassing efforts for Mr. Bloomberg's Campaign.

152.    Representative Plaintiffs and the FLSA Collective did not exercise a meaningful degree of independent discretion with respect to the exercise of their duties and were required to follow the policies, practices, and procedures set by the Campaign.  Representative Plaintiffs and the FLSA Collective did not have any independent discretionary authority to deviate from these policies, practices, and procedures.

## CLASS-WIDE ALLEGATIONS

153.    Representative Plaintiffs bring the Causes of Action for Claims Sixteen and

Seventeen as a class action pursuant to Rule 23.

154.    The putative class that Plaintiffs seek to represent is defined as:

The Campaign's FOs and other Field Employees throughout the United States who were
terminated on or after March 4, 2020 (the "Class").

155.    To the extent the Court applies different state laws to Claims Sixteen and Seventeen

depending on the states where Class Members reside, the Class should be divided into subclasses.

156.    Numerosity:  Upon information and belief, the Campaign employed thousands of

FOs and other Field Employees.  The number of putative Class Members are therefore far too

numerous to be individually joined in this lawsuit.

157.    Existence and Predominance of Common Questions:  There are questions of law

and fact common to Plaintiffs and putative Class Members that predominate over any questions

affecting only individual members of the Class.  These common questions of law and fact include,

without limitation:

      a.      Whether the Campaign unambiguously promised Class Members to
              provide employment, pay, and benefits through November 2020;

      b.      Whether the Campaign reasonably expected or foresaw that Class
              Members would act in reliance on that promise;

      c.      Whether Class Members acted in reliance on the Campaign's
              repeated promises of employment, pay, and insurance through
              November 2020 by accepting the Campaign's job offer and
              continuing to work for the Campaign;

      d.      Whether Defendant failed to provide employment, pay and benefits
              to Class Members as promised through November 2020;

      e.      Whether Class Members were injured by the Campaign's refusal to
              perform its promise of employment, pay, and benefits through
              November 2020;

> f.   Whether injustice can only be avoided by enforcement of the promise;
>
> g.   Whether the Campaign made a false statement concerning the material fact that Class Members would be employed, paid, and have benefits through November 2020;
>
> h.   Whether the Campaign had knowledge that the statement was false, or it acted in reckless disregard as to whether it was true;
>
> i.   Whether the Campaign made the false statement with the intent that it be acted upon by Class Members;
>
> j.   Whether Class Members acted in reliance on the false statement; and
>
> k.   Whether Class Members suffered injury by acting in reliance on the false statement.

158.   <u>Typicality</u>:  Representative Plaintiffs' claims are typical of the claims of the Class they seek to represent.  Representative Plaintiffs relied on the Campaign's false promises when they agreed to work for the Campaign.  Representative Plaintiffs and the putative Class Members sustained the same or similar injuries and damages of loss of other opportunities, income, health insurance, and other benefits.  Representative Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class they seek to represent.

159.   <u>Adequacy</u>:  Representative Plaintiffs will fairly and adequately represent and protect the interests of the Class that they seek to represent because Representative Plaintiffs' interests do not conflict with the interests of the members of the Class they seek to represent. Representative Plaintiffs have retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  Representative Plaintiffs and their Counsel will fairly and adequately protect the interests of the Class.

160.   <u>Superiority</u>:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Class Members is not

practicable, and questions of law and fact common to Representative Plaintiffs and putative Class

Members predominate over any questions affecting only individual members of the Class.

Individualized litigation increases the delay and expense to all parties and the Court.  By contrast,

class action treatment will allow those similarly situated persons to litigate their claims in the

manner that is most efficient and economical for the parties and the judicial system.

161.    In the alternative, the Class may be certified because the prosecution of separate

actions by the individual members of the Class would create a risk of inconsistent or varying

adjudication with respect to individual members of the Class, and, in turn, would establish

incompatible standards of conduct for the Campaign.

162.    Class treatment will allow those similarly situated persons to litigate their claims in

the manner most efficient and economical for the Parties and the judicial system.

163.    Representative Plaintiffs know of no difficulty that would be encountered in the

management of this litigation that would preclude its maintenance as a class action.

## <u>NEW YORK CLASS ALLEGATIONS</u>

164.    The New York Plaintiff brings this claim as a class action pursuant to Rule 23.

165.    The putative class that the New York Plaintiff seeks to represent is a class of FOs

who worked in New York during the relevant period (the "New York Class").

166.    <u>Numerosity</u>:  Upon information and belief, the number of FOs employed by the

Campaign in New York exceeds forty.  The number of putative New York Class Members are

therefore far too numerous to be individually joined in this lawsuit.

167.    <u>Existence and Predominance of Common Questions</u>:  There are questions of law

and fact common to the New York Plaintiff and putative New York Class Members that

predominate over any questions affecting only individual members of the New York Class.  These

common questions of law and fact include, without limitation:

a.  Whether the Campaign failed to pay the New York Plaintiff and the members of the New York Class overtime wages for hours that they worked in excess of 40 hours per workweek;

b.  Whether the Campaign misclassified the New York Plaintiff and the members of the New York Class as exempt from the protections of the NYLL;

c.  Whether the Campaign failed to furnish the New York Plaintiff and the members of the New York Class with an accurate statement of wages that included the hourly rate or rates of pay and overtime rate of rates of pay, as required by the Wage Theft Prevention Act;

d.  Whether the Campaign failed to furnish the New York Plaintiff and the members of the New York Class with an accurate notice at the time of hire, which included overtime rates, as required by the Wage Theft Prevention Act; and

e.  Whether the Campaign failed to furnish the New York Plaintiff and the members of the New York Class with an accurate annual notice, as required by the Wage Theft Prevention Act.

168.  <u>Typicality</u>: The New York Plaintiff's claims are typical of those claims which could be alleged by any New York Class Member, and the relief sought is typical of the relief which would be sought by each New York Class Member in separate actions.

169.  <u>Adequacy</u>: The New York Plaintiff will fairly and adequately represent and protect the interests of the New York Class that he seeks to represent because the New York Plaintiff's interests do not conflict with the interests of the members of the New York Class he seeks to represent.  The New York Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The New York Plaintiff and his Counsel will fairly and adequately protect the interests of the New York Class.

170.  <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative New York Class

Members is not practicable, and questions of law and fact common to the New York Plaintiff and putative New York Class Members predominate over any questions affecting only individual members of the New York Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

171.    In the alternative, the New York Class may be certified because the prosecution of separate actions by the individual members of the New York Class would create a risk of inconsistent or varying adjudication with respect to individual members of the New York Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

172.    Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

173.    The New York Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CALIFORNIA CLASS ALLEGATIONS

174.    The California Plaintiff brings this claim as a class action pursuant to Rule 23.

175.    The putative class that the California Plaintiff seeks to represent is a class of FOs who worked in California during the relevant period (the "California Class").

176.    Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in California exceeds forty.  The number of putative California Class Members are therefore far too numerous to be individually joined in this lawsuit.

177.    Existence and Predominance of Common Questions:  There are questions of law and fact common to the California Plaintiff and putative California Class Members that

App. 177

predominate over any questions affecting only individual members of the California Class.  These

common questions of law and fact include, without limitation:

    a.    Whether the Campaign unlawfully failed to pay the California Class Members overtime compensation owed, in violation of the California Labor Code and related regulations;

    b.    Whether California Class members were non-exempt employees entitled to overtime compensation for overtime hours worked under California law;

    c.    Whether the Campaign unlawfully failed to keep and furnish the California Class Members with timely, accurate, and itemized records of hours worked in violation of Cal. Labor Code §§ 226 and 1174;

    d.    Whether the Campaign unlawfully failed to furnish the California Class members with proper meal and rest periods, in violation Cal. Lab. Code §§ 226.7, 512 and applicable wage orders;

    e.    Whether the Campaign failed to reimburse the California Class Members for reasonable and necessary business expenses in violation of Cal. Labor Code § 2802; and

    f.    Whether the Campaign failed to timely pay wages to the California Class Members in violation of Cal. Lab. Code §§ 204, 210.

178.    <u>Typicality</u>:  The California Plaintiff's claims are typical of those claims which could be alleged by any California Member, and the relief sought is typical of the relief which would be sought by each California Class Member in separate actions.

179.    <u>Adequacy</u>:  The California Plaintiff will fairly and adequately represent and protect the interests of the California Class that she seeks to represent because the California Plaintiff's interests do not conflict with the interests of the members of the California Class she seeks to represent.  The California Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The California Plaintiff and her Counsel will fairly and adequately protect the interests of the California Class.

180.   Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative California Class Members is not practicable, and questions of law and fact common to the California Plaintiff and putative California Class Members predominate over any questions affecting only individual members of the California Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

181.   In the alternative, the California Class may be certified because the prosecution of separate actions by the individual members of the California Class would create a risk of inconsistent or varying adjudication with respect to individual members of the California Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

182.   Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

183.   The California Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## MICHIGAN CLASS ALLEGATIONS

184.   The Michigan Plaintiff brings this claim as a class action pursuant to Rule 23.

185.   The putative class that the Michigan Plaintiff seeks to represent is a class of FOs who worked in Michigan during the relevant period (the "Michigan Class").  The Michigan Class is brought in the alternative to the FLSA Collective.

186.   Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in Michigan exceeds forty.  The number of putative Michigan Class Members are

therefore far too numerous to be individually joined in this lawsuit.

187.   <u>Existence and Predominance of Common Questions</u>:  There are questions of law and fact common to the Michigan Plaintiff and putative Michigan Class Members that predominate over any questions affecting only individual members of the Michigan Class.  These common questions of law and fact include, without limitation:

a.   Whether the Campaign failed to pay the Michigan Plaintiff and the members of the Michigan Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

b.   Whether the Campaign misclassified the Michigan Plaintiff and the members of the Michigan Class as exempt from the protections of the MWOWA.

188.   <u>Typicality</u>:  The Michigan Plaintiff's claims are typical of those claims which could be alleged by any Michigan Class Member, and the relief sought is typical of the relief which would be sought by each Michigan Class Member in separate actions.

189.   <u>Adequacy</u>:  The Michigan Plaintiff will fairly and adequately represent and protect the interests of the Michigan Class that he seeks to represent because the Michigan Plaintiff's interests do not conflict with the interests of the members of the Michigan Class he seeks to represent.  The Michigan Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Michigan Plaintiff and his Counsel will fairly and adequately protect the interests of the Michigan Class.

190.   <u>Superiority</u>:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Michigan Class Members is not practicable, and questions of law and fact common to the Michigan Plaintiff and putative Michigan Class Members predominate over any questions affecting only individual members of the Michigan Class.  Individualized litigation increases the delay and expense to all

parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

191.    In the alternative, the Michigan Class may be certified because the prosecution of separate actions by the individual members of the Michigan Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Michigan Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

192.    Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

193.    The Michigan Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**WISCONSIN CLASS ALLEGATIONS**

194.    The Wisconsin Plaintiff brings this claim as a class action pursuant to Rule 23.

195.    The putative class that the Wisconsin Plaintiff seeks to represent is a class of FOs who worked in Wisconsin during the relevant period (the "Wisconsin Class").

196.    Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in Wisconsin exceeds forty.  The number of putative Wisconsin Class Members are therefore far too numerous to be individually joined in this lawsuit.

197.    Existence and Predominance of Common Questions:  There are questions of law and fact common to the Wisconsin Plaintiff and putative Wisconsin Class Members that predominate over any questions affecting only individual members of the Wisconsin Class.  These common questions of law and fact include, without limitation:

- 51 -

> a.   Whether the Campaign failed to pay the Wisconsin Plaintiff and the members of the Wisconsin Class overtime wages for hours that they worked in excess of 40 hours per workweek; and
>
> b.   Whether the Campaign misclassified the Wisconsin Plaintiff and the members of the Wisconsin Class as exempt from the protections of the Wisconsin state law.

198.   <u>Typicality</u>:  The Wisconsin Plaintiff's claims are typical of those claims which could be alleged by any Wisconsin Class Member, and the relief sought is typical of the relief which would be sought by each Wisconsin Class Member in separate actions.

199.   <u>Adequacy</u>:  The Wisconsin Plaintiff will fairly and adequately represent and protect the interests of the Wisconsin Class that he seeks to represent because the Wisconsin Plaintiff's interests do not conflict with the interests of the members of the Wisconsin Class he seeks to represent.  The Wisconsin Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Wisconsin Plaintiff and his Counsel will fairly and adequately protect the interests of the Wisconsin Class.

200.   <u>Superiority</u>:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Wisconsin Class Members is not practicable, and questions of law and fact common to the Wisconsin Plaintiff and putative Wisconsin Class Members predominate over any questions affecting only individual members of the Wisconsin Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

201.   In the alternative, the Wisconsin Class may be certified because the prosecution of separate actions by the individual members of the Wisconsin Class would create a risk of

inconsistent or varying adjudication with respect to individual members of the Wisconsin Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

202.    Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

203.    The Wisconsin Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## ILLINOIS CLASS ALLEGATIONS

204.    The Illinois Plaintiff brings this claim as a class action pursuant to the Rule 23.

205.    The putative class that the Illinois Plaintiff seeks to represent is a class of FOs who worked in Illinois during the relevant period (the "Illinois Class").

206.    <u>Numerosity</u>:  Upon information and belief, the number of FOs employed by the Campaign in Illinois exceeds forty.  The number of putative Illinois Class Members are therefore far too numerous to be individually joined in this lawsuit.

207.    <u>Existence and Predominance of Common Questions</u>:  There are questions of law and fact common to the Illinois Plaintiff and putative Illinois Class Members that predominate over any questions affecting only individual members of the Illinois Class.  These common questions of law and fact include, without limitation:

      a.    Whether the Campaign failed to pay the Illinois Plaintiff and the members of the Illinois Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

      b.    Whether the Campaign misclassified the Illinois Plaintiff and the members of the Illinois Class as exempt from the protections of the IMWL.

208.    <u>Typicality</u>:  The Illinois Plaintiff's claims are typical of those claims which could be alleged by any Illinois Class Member, and the relief sought is typical of the relief which would be sought by each Illinois Class Member in separate actions.

- 53 -

209.    <u>Adequacy</u>:  The Illinois Plaintiff will fairly and adequately represent and protect the interests of the Illinois Class that she seeks to represent because the Illinois Plaintiff's interests do not conflict with the interests of the members of the Illinois Class she seeks to represent.  The Illinois Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Illinois Plaintiff and her Counsel will fairly and adequately protect the interests of the Illinois Class.

210.    <u>Superiority</u>:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Illinois Class Members is not practicable, and questions of law and fact common to the Illinois Plaintiff and putative Illinois Class Members predominate over any questions affecting only individual members of the Illinois Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

211.    In the alternative, the Illinois Class may be certified because the prosecution of separate actions by the individual members of the Illinois Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Illinois Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

212.    Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

213.    The Illinois Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## <u>MINNESOTA CLASS ALLEGATIONS</u>

214.    The Minnesota Plaintiff brings this claim as a class action pursuant to Rule 23.

**App. 184**

215.    The putative class that the Minnesota Plaintiff seeks to represent is a class of FOs who worked in Minnesota during the relevant period (the "Minnesota Class").

216.    <u>Numerosity</u>:  Upon information and belief, the number of FOs employed by the Campaign in Minnesota exceeds forty.  The number of putative Minnesota Class Members are therefore far too numerous to be individually joined in this lawsuit.

217.    <u>Existence and Predominance of Common Questions</u>:  There are questions of law and fact common to the Minnesota Plaintiff and putative Minnesota Class Members that predominate over any questions affecting only individual members of the Minnesota Class.  These common questions of law and fact include, without limitation:

  a.  Whether the Campaign failed to pay the Minnesota Plaintiff and the members of the Minnesota Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

  b.  Whether the Campaign misclassified the Minnesota Plaintiff and the members of the Minnesota Class as exempt from the protections of the MFLSA.

218.    <u>Typicality</u>:  The Minnesota Plaintiff's claims are typical of those claims which could be alleged by any Minnesota Class Member, and the relief sought is typical of the relief which would be sought by each Minnesota Class Member in separate actions.

219.    <u>Adequacy</u>:  The Minnesota Plaintiff will fairly and adequately represent and protect the interests of the Minnesota Class that she seeks to represent because the Minnesota Plaintiff's interests do not conflict with the interests of the members of the Minnesota Class she seeks to represent.  The Minnesota Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Minnesota Plaintiff and her Counsel will fairly and adequately protect the interests of the Minnesota Class.

220.    <u>Superiority</u>:  A class action is superior to other available means for the fair and

efficient adjudication of this controversy.  Individual joinder of all putative Minnesota Class

Members is not practicable, and questions of law and fact common to the Minnesota Plaintiff and

putative Minnesota Class Members predominate over any questions affecting only individual

members of the Minnesota Class.  Individualized litigation increases the delay and expense to all

parties and the Court.  By contrast, class action treatment will allow those similarly situated

persons to litigate their claims in the manner that is most efficient and economical for the parties

and the judicial system.

221.    In the alternative, the Minnesota Class may be certified because the prosecution of

separate actions by the individual members of the Minnesota Class would create a risk of

inconsistent or varying adjudication with respect to individual members of the Minnesota Class,

and, in turn, would establish incompatible standards of conduct for the Campaign.

222.    Class treatment will allow those similarly situated persons to litigate their claims in

the manner most efficient and economical for the Parties and the judicial system.

223.    The Minnesota Plaintiff knows of no difficulty that would be encountered in the

management of this litigation that would preclude its maintenance as a class action.

## NORTH CAROLINA CLASS ALLEGATIONS

224.    The North Carolina Plaintiff brings this claim as a class action pursuant to Rule 23.

225.    The putative class that the North Carolina Plaintiff seeks to represent is a class of

FOs who worked in North Carolina during the relevant period (the "North Carolina Class").  The

North Carolina Class is brought in the alternative to the FLSA Collective.

226.    Numerosity:  Upon information and belief, the number of FOs employed by the

Campaign in North Carolina exceeds forty.  The number of putative North Carolina Class

Members are therefore far too numerous to be individually joined in this lawsuit.

- 56 -

App. 186

227.   <u>Existence and Predominance of Common Questions</u>:  There are questions of law and fact common to the North Carolina Plaintiff and putative North Carolina Class Members that predominate over any questions affecting only individual members of the North Carolina Class. These common questions of law and fact include, without limitation:

      a.      Whether the Campaign failed to pay the North Carolina Plaintiff and the members of the North Carolina Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

      b.      Whether the Campaign misclassified the North Carolina Plaintiff and the members of the North Carolina Class as exempt from the protections of the NCWHA, N.C. Gen. Stat. § 95-25.1 *et seq.*

228.   <u>Typicality</u>:  The North Carolina Plaintiff's claims are typical of those claims which could be alleged by any North Carolina Class Member, and the relief sought is typical of the relief which would be sought by each North Carolina Class Member in separate actions.

229.   <u>Adequacy</u>:  The North Carolina Plaintiff will fairly and adequately represent and protect the interests of the North Carolina Class that he seeks to represent because the North Carolina Plaintiff's interests do not conflict with the interests of the members of the North Carolina Class he seeks to represent.  The North Carolina Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The North Carolina Plaintiff and his Counsel will fairly and adequately protect the interests of the North Carolina Class.

230.   <u>Superiority</u>:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative North Carolina Class Members is not practicable, and questions of law and fact common to the North Carolina Plaintiff and putative North Carolina Class Members predominate over any questions affecting only individual members of the North Carolina Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly

situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

231.     In the alternative, the North Carolina Class may be certified because the prosecution of separate actions by the individual members of the North Carolina Class would create a risk of inconsistent or varying adjudication with respect to individual members of the North Carolina Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

232.     Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

233.     The North Carolina Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act – Unpaid Overtime**
**(Brought on behalf of Plaintiffs and the FLSA Collective)**

234.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

235.     The Campaign engaged in a widespread pattern and practice of violating the FLSA, as described in this Collective and Class Action Complaint.

236.     Plaintiffs have consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).

237.     At all relevant times, Plaintiffs and other similarly situated former employees were engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

238.     The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to the Campaign.

- 58 -

239.    The Campaign is an employer engaged in commerce within the meaning of 29

U.S.C. §§ 206(a) and 207(a).

240.    At all times relevant, Plaintiffs were employees within the meaning of 29 U.S.C.

§§ 203(e) and 207(a).

241.    The Campaign failed to pay Plaintiffs and other similarly situated former FOs the

overtime wages to which they were entitled under the FLSA.

242.    The Campaign has not made a good faith effort to comply with the FLSA with

respect to its compensation of Plaintiffs and other similarly situated former FOs.

243.    As a result of the Campaign's violations of the FLSA, Plaintiffs and all other

similarly situated FOs have suffered damages by being denied overtime wages in accordance

with 29 U.S.C. §§ 201 *et seq.*

244.    As a result of the unlawful acts of the Campaign, Representative Plaintiffs and

other similarly situated former FOs have been deprived of overtime compensation and other

wages in amounts to be determined at trial, and are entitled to recovery of such amounts,

liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant

to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
### NYLL - Unpaid Overtime
### NYLL Article 6, § 190 *et seq.* and Article 19, § 650 *et seq.*
### (Brought by the New York Plaintiff on Behalf of Himself and the New York Class)

245.    The New York Plaintiff, on behalf of himself and all members of the New York

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

246.    The foregoing conduct, as alleged, violates the NYLL.

247.    At all relevant times, the Campaign has been an "employer" within the meaning

of N.Y. Lab. Law §§ 190, 651.

248.     At all relevant times, the Campaign employed employees, including the New York Plaintiff and each of the members of the New York Class, within the meaning of N.Y. Lab. Law §§ 190, 651.

249.     NYLL requires an employer, such as the Campaign, to pay overtime compensation to all non-exempt employees.  The New York Plaintiff and all members of the New York Class are not exempt from overtime pay requirements under NYLL.

250.     At all relevant times the Campaign had a policy and practice of failing and refusing to pay overtime pay to the New York Plaintiff and members of the New York Class for their hours worked in excess of forty (40) hours per workweek.

251.     By failing to pay wages earned and due to the New York Plaintiff and members of the New York Class for their hours worked in excess of forty hours per workweek, the Campaign has violated N.Y. Labor Law Article 6, §190 *et seq.*, Article 19, § 650 *et seq.*, and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.  These violations were willful within the meaning of N.Y. Labor Law §§ 198, 663.

252.     The New York Plaintiff, on behalf of himself and members of the putative New York Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by N.Y. Labor Law Article 6, §190 *et seq.*, Article 19, § 650 *et seq.*, and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2, and such other legal and equitable relief as this Court deems just and proper.

253.     The New York Plaintiff, on behalf of himself and members of the New York Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign as provided by N.Y. Lab. Law §§ 198, 663.

**THIRD CAUSE OF ACTION**
**NYLL – Failure to Provide Wage Notices**
**(Brought by the New York Plaintiff on Behalf of Himself and the New York Class)**

254.    The New York Plaintiff, on behalf of himself and all members of the New York

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

255.    The Campaign has willfully failed to supply the New York Plaintiff and the members

of the New York Class with wage notices at the time of their hire, as required by the NYLL, Article 6,

§ 195(1), in English or in the language identified as their primary language, containing their

hourly rate or rates of pay and overtime rate of rates of pay, if applicable.

256.    Through its knowing or intentional failure to provide the New York Plaintiff and the

New York Class Members with the wage notices required by the NYLL, the Campaign has willfully

violated NYLL, Article 6, §§ 190 *et seq.*, and the supporting New York State Department of Labor

Regulations.

257.    Due to the Campaign's willful violations of NYLL, Article 6, § 195(1), the New York

Plaintiff and New York Class Members are entitled to statutory penalties of $50 for each workday that

the Campaign failed to provide them with wage notices, or up to a total of $5,000, reasonable attorneys'

fees, costs, and injunctive and declaratory relief, as provided for by the NYLL, Article 6, § 198(1-b).

**FOURTH CAUSE OF ACTION**
**NYLL – Failure to Provide Accurate Wage Statements**
**(Brought by Plaintiff Goldstein on Behalf of Himself and the New York Class)**

258.    The New York Plaintiff, on behalf of himself and all members of the New York

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

259.    The Campaign has willfully failed to supply New York Plaintiff and New York Class

with accurate statements of wages as required by the NYLL, Article 6, § 195(3), containing the tip

allowance claimed as part of the minimum wage.

260.     Through their knowing or intentional failure to provide the New York Plaintiff and

New York Class with the accurate wage statements required by the NYLL, the Campaign has willfully

violated NYLL, Article 6, §§ 190 *et seq.*, and the supporting New York State Department of Labor

Regulations.

261.     Due to the Campaign's willful violations of NYLL, Article 6, § 195(3), after 2015, the

New York Plaintiff and New York Class are entitled to statutory penalties of $250 for each workweek

that the Campaign failed to provide them with accurate wage statements, or a total of up to $5,000,

reasonable attorneys' fees, costs, and injunctive and declaratory relief, as provided for by the NYLL,

Article 6, § 198(1-d).

## FIFTH CAUSE OF ACTION
### California Wage Laws – Overtime Wages
### California Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 510, 1194, 1198
### (Brought by the California Plaintiff on Behalf of Herself and the California Class)

262.     The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

263.     The foregoing conduct, as alleged, violates California Wage Laws.

264.     At all relevant times, the Campaign has been an "employer" within the meaning

of California Wage Laws.

265.     At all relevant times, the Campaign employed employees, including the California

Plaintiff and each of the members of the California Class.

266.     The California Wage Laws require an employer, such as the Campaign, to pay

overtime compensation to all non-exempt employees for hours worked over forty per workweek

or over eight per day.  The California Plaintiff and all members of the California Class are not

exempt from overtime pay requirements under California Wage Laws.

267.     At all relevant times the Campaign had a policy and practice of failing and

- 62 -

App. 192

refusing to pay overtime pay to the California Plaintiff and members of the California Class for

their hours worked in excess of eight hours per day and forty hours per workweek.

268.     As a direct and proximate result of Defendant's unlawful conduct, as set forth

herein, Plaintiffs and California Class members sustained damages, including loss of earnings for

hours of overtime worked for the benefit of Defendant in an amount to be established at trial,

prejudgment interest, and costs and attorneys' fees, pursuant to statute and other applicable law.

### SIXTH CAUSE OF ACTION
**California Wage Laws – Record-Keeping Violations**
**California Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 226, 1174, & 1174.5**
**(Brought by the California Plaintiff on Behalf of Herself and the California Class)**

269.     The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

270.     The Campaign knowingly and intentionally failed to provide timely,

accurate, itemized wage statements including, *inter alia*, hours worked, to the California

Plaintiff and California Class Members in accordance with California Wage Order Nos. 4-

2001 and 7-2001 and California Labor Code § 226(a).  Such failure caused injury to the

California Plaintiff and the California Class, by, among other things, impeding them from

knowing the amount of wages to which they were entitled.  The Campaign failed to maintain

accurate records of hours worked by the California Plaintiff and California Class Members as

required under Labor Code § 1174(d).

271.     The California Plaintiff and California Class Members are entitled to and

seek injunctive relief requiring the Campaign to comply with California Labor Code

§§ 226(a) and 1174(d), and further seek the amount provided under California Labor Code

§§ 226(e) and 1174.5, including the greater of all actual damages or fifty dollars ($50) for the

- 63 -

initial pay period in which a violation occurs and one hundred dollars ($100) per employee

for each violation in a subsequent pay period.

### SEVENTH CAUSE OF ACTION
**California Wage Laws – Meal and Rest Period Provisions**
**Cal. Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 218.5, 226.7, & 512**
**(Brought by the California Plaintiff on Behalf of Herself and the California Class)**

272.    The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

273.    The California Plaintiff and the California Class members regularly work

and/or have worked in excess of five-hour shifts without being afforded at least a half-hour

meal break during which they were relieved of all duty, and more than ten-hour shifts

without being afforded a second half-hour meal break in which they were relieved of all duty,

as required by California Labor Code §§ 226.7 and 512 and Wage Order Nos. 4-2001 and 7-

2001, § 11.

274.    The California Plaintiff and the California Class members regularly work

and/or have worked in excess of three and one-half hours without being authorized and

permitted to take rest periods at the rate of ten minutes net rest time per four hours or major

fraction thereof, as required by California Labor Code § 226.7 and Wage Order Nos. 4-2001

and 7-2001, § 12.

275.    As a result of the Campaign's failure to afford proper meal and rest periods,

the Campaign is liable to the California Plaintiff and California Class members for one hour of

additional pay at the regular rate of compensation for each workday that the proper meal or rest

periods were not provided, pursuant to California Labor Code § 226.7 and Wage Order Nos. 4-

2001 and 7-2001, §§ 11-12.

## EIGHTH CAUSE OF ACTION
### California Wage Laws – Business Expenses
### Cal. Lab. Code § 2802; Cal. Wage Order Nos. 4-2001 & 7-2001
### (Brought by the California Plaintiff on Behalf of Herself and the California Class)

276.    The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

277.    California Labor Code § 2802 provides that "[a]n employer shall indemnify his or

her employee for all necessary expenditures or losses incurred by the employee in direct

consequence of the discharge of his or her duties."

278.    The Campaign failed to indemnify and reimburse the California Plaintiff and the

California Class Members for necessary expenditures, including but not limited to travel

expenses, that they incurred as a direct result of the duties they performed for the Campaign

benefit and/or at the Campaign's direction.

279.    As a result, the California Plaintiff seeks unreimbursed expenses, penalties,

interest, costs incurred, and attorneys' fees pursuant to California Labor Code § 2802(b).

## NINTH CAUSE OF ACTION
### California Wage Laws – Untimely Payment of Wages
### Cal. Labor Code §§ 204, 210
### (Brought by the California Plaintiff on Behalf of Herself and the California Class)

280.    The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

281.    Under Labor Code § 204, labor performed between the 1st and 15th days of any

calendar month will be paid for between the 16th and the 26th of that month, and that labor

performed between the 16th and the last day of any calendar month will be paid for between the

1st and the 10th day of the following month.  Other payroll periods such as weekly, biweekly

(every two weeks) or semimonthly (twice per month), when the earning period is something

other than between the 1st and 15th, and 16th and last day of the month, must be paid within

seven calendar days of the end of the payroll period within which the wages were earned.

282.    During the Relevant Period, the Campaign failed to pay the California Plaintiff

and California Class Members in a timely manner all of their wages earned, in violation of Cal.

Lab. Code § 204.

283.    The California Plaintiff and California Class Members are entitled to and seek

injunctive relief requiring the Campaign to comply with Cal. Lab. Code § 204, and statutory

damages under Cal. Lab. Code § 210(a), which provides that persons who fail to pay wages as

provided in Section 204 are subject to the following statutory penalties: "(1) For any initial

violation, one hundred dollars ($100) for each failure to pay each employee; (2) For each

subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each

failure to pay each employee, plus 25 percent of the amount unlawfully withheld."

### TENTH CAUSE OF ACTION
**California Wage Laws – Unfair Competition**
**California Business & Professions Code §§ 17200** *et seq.*
**(Brought by the California Plaintiff on Behalf of Herself and the California Class)**

284.    The California Plaintiff, on behalf of herself and all members of the California

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

285.    The foregoing conduct, as alleged, violated the California Unfair Competition

Law ("UCL"). The UCL prohibits unfair competition by prohibiting, *inter alia*, any unlawful

or unfair business acts or practices.

286.    Beginning at a date unknown to the California Plaintiff, but at least as long

ago as January 1, 2020, the Campaign committed acts of unfair competition, as defined by the

UCL, by, among other things, engaging in the acts and practices described herein. The

Campaign's conduct as alleged herein injured the California Plaintiff and the California Class

- 66 -

**App. 196**

Members by wrongfully denying them earned wages, and therefore was substantially injurious to them.

287.   The Campaign engaged in unfair competition in violation of the UCL by violating, *inter alia*, each of the following laws.  Each of these violations constitutes an independent and separate violation of the UCL:

      a.      FLSA, 29 U.S.C. §§ 201 *et seq.*;

      b.      Cal. Lab. Code §§ 201-204;

      c.      Cal. Lab. Code § 1194;

      d.      Cal. Lab. Code § 226;

      e.      Cal. Lab. Code § 1174;

      f.      Cal. Lab. Code § 510; and

      g.      Cal. Lab. Code § 2802.

288.   The Campaign's course of conduct, acts, and practices in violation of the California laws mentioned in the above paragraph constitute a separate and independent violation of the UCL.  The Campaign's conduct described herein violated the policy or spirit of such laws or otherwise significantly threatens or harms competition.

289.   The unlawful and unfair business practices and acts of the Campaign, described above, injured the California Plaintiff and California Class Members.

290.   The California Plaintiff, on behalf of herself and the California Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by the UCL and California Labor Code §§ 218, 218.5, and 1194.

291.   The California Plaintiff, on behalf of herself and the California Class, seeks restitution in the amount of the respective unpaid wages earned and due, at a rate not less than

- 67 -

one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, or 8 hours in a day, and double the regular rate of pay for work performed in excess of 12 hours per day.

### ELEVENTH CAUSE OF ACTION
**Michigan Wage Law - Overtime**
**MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412**
**(Brought by the Michigan Plaintiff on Behalf of Himself and the Michigan Class)**

292.    The Michigan Plaintiff, on behalf of himself and all members of the Michigan Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

293.    The foregoing conduct, as alleged, violates the MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412, and their implementing regulations.

294.    At all relevant times, the Campaign has been an "employer" within the meaning of MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412.

295.    At all relevant times, the Campaign employed employees, including the Michigan Plaintiff and each of the members of the Michigan Class, within the meaning of Mich. Comp. Laws §§ 408.414a; 408.412.

296.    The MWOWA requires an employer, such as the Campaign to pay overtime compensation to all non-exempt employees.  The Michigan Plaintiff and all members of the Michigan are not exempt from overtime pay requirements under MWOA.

297.    At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the Michigan Plaintiff and members of the Michigan Class for their hours worked in excess of forty (40) hours per workweek.

298.    By failing to pay wages earned and due to the Michigan Plaintiff and members of the Michigan Class for their hours worked in excess of forty hours per workweek, the Campaign has violated Mich. Comp. Laws § 408.414a.   These violations were willful.

299.    The Michigan Plaintiff, on behalf of himself and members of the putative

Michigan Class, seeks damages in the amount of the respective unpaid wages earned and due at a

rate of not less than one and one-half times the regular rate of pay for work performed in excess

of forty hours in a workweek, as well as liquidated damages in an amount equal to the amount of

unpaid wages due, as provided by Mich. Comp. Laws §§ 408.414a, 408.419(1)(a), and such

other legal and equitable relief as this Court deems just and proper.

300.    The Michigan Plaintiff, on behalf of himself and members of the Michigan Class,

seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign as provided

by Mich. Comp. Laws § 408.419(1)(a).

## TWELFTH CAUSE OF ACTION
### Wisconsin Wage Law - Overtime
### Wis. Stat. §§ 103 and 104, and Wis. Admin. Code § DWD 274.03
### (Brought by the Wisconsin Plaintiff on Behalf of Himself and the Wisconsin Class)

301.    The Wisconsin Plaintiff, on behalf of himself and all members of the Wisconsin

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

302.    The foregoing conduct, as alleged, violates Wis. Stat. § 103 and Wis. Admin.

Code § DWD 274.03.

303.    At all relevant times, the Campaign has been an "employer" within the meaning

of Wis. Stat. § 103 and Wis. Admin. Code § DWD 274.03.

304.    At all relevant times, the Campaign has employed employees, including the

Wisconsin Plaintiff and each of the members of the Wisconsin Class, within the meaning of Wis.

Stat. §103 and Wis. Admin. Code § DWD 274.03.

305.    Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03 require an employer, such

as the Campaign, to pay overtime compensation to all non-exempt employees.  The Wisconsin

Plaintiff and all members of the Wisconsin Class are not exempt from overtime pay requirements

under Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03.

306.    At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the Wisconsin Plaintiff and members of the Wisconsin Class for their hours worked in excess of forty (40) hours per workweek.

307.    By failing to pay wages earned and due to the Wisconsin Plaintiff and members of the Wisconsin Class for their hours worked in excess of forty hours per workweek, the Campaign has violated Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03.

308.    The Wisconsin Plaintiff, on behalf of himself and members of the putative Wisconsin Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by Wis. Stat. §103, and such other legal and equitable relief as this Court deems just and proper, including liquidated damages pursuant to Wis. Stat. § 109.11(2)(a).

309.    The Wisconsin Plaintiff, on behalf of himself and members of the Wisconsin Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by Wis. Stat. §109.03(6).

### THIRTEENTH CAUSE OF ACTION
**Illinois Wage Law - Overtime**
**IMWL, 820 ILCS 105/1 *et seq.*,**
**(Brought by the Illinois Plaintiff on Behalf of Herself and the Illinois Class)**

310.    The Illinois Plaintiff, on behalf of herself and all members of the Illinois Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

311.    The foregoing conduct, as alleged, violates the IMWL, 820 ILCS 105/1 *et seq.*, and their implementing regulations.  At all relevant times, the Campaign has been an "employer" within the meaning of 820 ILCS 105/3(c).  At all relevant times, the Campaign has employed

employees including the Illinois Plaintiff and each of the members of the Illinois Class, within the meaning of 820 ILCS 105/3(d).

312.    The Illinois wage and hour laws require an employer, such as Defendant the Campaign, to pay overtime compensation to all non-exempt employees.  The Illinois Plaintiff and all members of the Illinois Class are not exempt from overtime pay requirements under Illinois law.

313.    At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the Illinois Plaintiff and members of the Illinois Class for their hours worked in excess of forty (40) hours per workweek.

314.    By failing to pay wages earned and due to the Illinois Plaintiff and members of the Illinois Class for their hours worked in excess of forty hours per workweek, the Campaign has violated 820 ILCS 105/4a.

315.    The Illinois Plaintiff, on behalf of herself and members of the putative Illinois Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by 820 ILCS 105/4a; and other damages, including damages of 5% of the amount of underpayments for each month the wages remain unpaid, and treble damages on all unpaid overtime wages pursuant to 820 ILCS 105/12(a); and such other legal and equitable relief as this Court deems just and proper.

316.    The Illinois Plaintiff, on behalf of herself and members of the Illinois Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by 820 ILCS 105/12(a).

## FOURTEENTH CAUSE OF ACTION
### Minnesota - Overtime
### MFLSA §§ 177.23, 177.25 and Minn. R. 5200 *et seq.*
### (Brought by the Minnesota Plaintiff on Behalf of Herself and the Minnesota Class)

317.    The Minnesota Plaintiff, on behalf of herself and all members of the Minnesota

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

318.    The foregoing conduct, as alleged, violates the MFLSA, Minn. Stat. §§ 177.23,

177.25 and its implementing regulations.

319.    At all relevant times, the Campaign has been an "employer" within the meaning

of MFLSA, Minn. Stat. §§ 177.23, 177.25.

320.    At all relevant times, the Campaign employed employees, including the

Minnesota Plaintiff and each of the members of the Minnesota Class, within the meaning of

MFLSA, Minn. Stat. §§ 177.23, 177.25.

321.    The MFLSA requires an employer, such as the Campaign, to pay overtime

compensation to all non-exempt employees.  The Minnesota Plaintiff and all members of the

Minnesota Class are not exempt from overtime pay requirements under MFLSA.

322.    At all relevant times, the Campaign had a policy and practice of failing and

refusing to pay overtime pay to the Minnesota Plaintiff and members of the Minnesota Class for

their hours worked in excess of forty-eight (48) hours per workweek.

323.    By failing to pay wages earned and due to the Minnesota Plaintiff and members of

the Minnesota Class for their hours worked in excess of forty-eight hours per workweek, the

Campaign has violated MFLSA, Minn. Stat. § 177.25 and Minn. R. 5200 *et seq.*  These

violations were willful.

324.    The Minnesota Plaintiff, on behalf of herself and members of the putative

Minnesota Class, seeks damages in the amount of the respective unpaid wages earned and due at

- 72 -

a rate of not less than one and one-half times the regular rate of pay for work performed in

excess of forty-eight hours in a workweek, as provided by MFLSA, Minn. Stat. § 177.27(8), and

such other legal and equitable relief as this Court deems just and proper.

325.     The Minnesota Plaintiff, on behalf of herself and members of the Minnesota

Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign as

provided by MFLSA, Minn. Stat. § 177.27(8).

**FIFTEENTH CAUSE OF ACTION**
**North Carolina Wage Law - Overtime**
**NCWHA, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.***
**(Brought by the North Carolina Plaintiff on Behalf of Himself and the North Carolina**
**Class)**

326.     The North Carolina Plaintiff, on behalf of himself and all members of the North

Carolina Class, realleges and incorporates by reference all allegations in all preceding

paragraphs.

327.     The foregoing conduct, as alleged, violates the NCWHA, N.C. Gen. Stat. Ann.

§ 95-25.1 *et seq.*

328.     At all relevant times, the Campaign has been an "employer" within the meaning

of N.C. Gen. Stat. Ann. § 95-25.2.

329.     At all relevant times, the Campaign has employed employees, including the North

Carolina Plaintiff and each of the members of the North Carolina Class, within the meaning of

N.C. Gen. Stat. Ann. § 95-25.2.

330.     The NCWHA requires an employer, such as the Campaign, to pay overtime

compensation to all non-exempt employees.  The North Carolina Plaintiff and all members of the

North Carolina Class are not exempt from overtime pay requirements under the NCWHA.

331.     At all relevant times, the Campaign had a policy and practice of failing and

- 73 -

refusing to pay overtime pay to the North Carolina Plaintiff and members of the North Carolina Class for their hours worked in excess of forty (40) hours per workweek.

332.     By failing to pay wages earned and due to the North Carolina Plaintiff and members of the North Carolina Class for their hours worked in excess of forty hours per workweek, the Campaign has violated the NCWHA, N.C. Gen. Stat. Ann. §95-25.1 *et seq.* These violations were willful and were not made in good faith.

333.     The North Carolina Plaintiff, on behalf of himself and members of the putative North Carolina Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by NCWHA, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.*, and such other legal and equitable relief as this Court deems just and proper.

334.     The North Carolina Plaintiff, on behalf of himself and members of the North Carolina Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by N.C. Gen. Stat. Ann. § 95-25.22

### SIXTEENTH CAUSE OF ACTION
**Fraudulent Inducement**
**(Brought on behalf of Plaintiffs and the Class)**

335.     Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

336.     The Campaign made a misrepresentation of material fact by repeatedly stating, both verbally and in writing, that FOs and other Field Employees would be employed by the Campaign through November 2020.  Specifically, the Campaign promised paid employment with family, employer-paid healthcare, and other benefits, to FOs and other Field Employees through November 2020.

**App. 204**

337.     The Campaign made this misrepresentation in order to induce employees to quit their then-current employment or forgo other opportunities, move, and work for the Campaign.

338.     Upon information and belief, the Campaign intended that FOs and other Field Employees rely on its promises in order to attract employees to the Campaign.

339.     Employees reasonably relied on the Campaign's representations, to their economic peril, in leaving their jobs and working for the Campaign.  In addition, based on the Campaign's fraudulent representations about their length of employment, field employees are left with potentially no healthcare in the face of a worldwide pandemic.

340.     But for the Campaign's misrepresentation, Field Employees would not have accepted employment with the Campaign.

341.     In contravention of its promise, the Campaign terminated the FOs and other Field Employees.

342.     Field Employees have been damaged by losing their jobs with the Campaign approximately eight months early, losing their income, and losing their healthcare and other benefits.

343.     The Campaign's conduct amounts to such gross, wanton or willful fraud, dishonest and intentional non-disclosure of material facts as to involve a high degree of moral culpability, making it appropriate to deter the Campaign from engaging in similar conduct in the future.

344.     For the foregoing reasons, the Court should award Plaintiffs and the Class compensatory damages, costs, interests, punitive damages, exemplary damages, and attorneys' fees.

## SEVENTEENTH CAUSE OF ACTION
### Promissory Estoppel
### (Brought on behalf of Plaintiffs and the Class)

345.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

346.   The Campaign clearly, unambiguously, and repeatedly promised both verbally and in writing, that FOs and other Field Employees would be employed by the Campaign through November 2020.  Specifically, the Campaign promised paid employment with benefits including employer-paid healthcare benefits to FOs and other Field Employees and their families through November 2020.

347.   FOs and other Field Employees reasonably relied on the Campaign's promise of continuous employment through November 2020 and benefits, including employer-paid healthcare benefits by, *inter alia*, resigning or taking leaves of absence from their then-current employment and relocating to different cities and/or states in order to work for the Campaign.

348.   FOs and other Field Employees reasonably and foreseeably relied on the Campaign's promise of continuous employment through November 2020 and employer-paid healthcare and other benefits.

349.   As a direct result of their reasonable reliance on the Campaign's promises, FOs and other Field Employees suffered damages.

350.   Plaintiffs and the Class are entitled to damages to be proven at trial, pre-judgment interest, and attorneys' fees.

- 76 -

**App. 206**

## PRAYER FOR RELIEF

**WHEREFORE**, Representative Plaintiffs, individually and on behalf of all other similarly situated persons, and Plaintiffs, individually, seek the following relief:

A.      Certify this action as a collective action under the FLSA pursuant to 29 U.S.C. § 216(b) (First Cause of Action);

B.      At the earliest time possible, allow Representative Plaintiffs to give notice of this collective action, or that the Court issue such notice, to all members of the FLSA Collective. Such notice should inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit, among other things;

C.      A declaratory judgment that Defendant has violated the FLSA;

D.      Designate Representative Plaintiffs as representatives of the Collective;

E.      Designate Plaintiffs' Counsel as Counsel for the Collective;

F.      Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor's regulations.

G.      A reasonable service award to compensate the Representative Plaintiffs for the time they have spent and will spend attempting to recover wages for the FLSA Collective and for the risks they took in doing so;

H.      Attorneys' fees and costs of suit;

I.      Prejudgment and post-judgment interest, as provided by law; and

J.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, Representative Plaintiffs, individually and on behalf of all other similarly situated persons, and Plaintiffs, individually, seek the following relief:

A.      Certify the case as a class action on behalf of the proposed Class of FOs and other

Field Employees on the fraudulent inducement and promissory estoppel claims (Sixteenth and Seventeenth Causes of Action);

      B.      Designate Representative Plaintiffs as representatives of the Class;

      C.      Designate Plaintiffs' Counsel as Class Counsel;

      D.      Find that the Campaign is liable to the Representative Plaintiffs and the proposed Class of FOs and other Field Employees for fraudulent inducement and promissory estoppel;

      E.      Order the Campaign to pay compensatory and punitive damages to proposed Class of FOs and other Field Employees and award attorneys' fees and costs; and

      F.      Such other injunctive and equitable relief as this Court shall deem just and proper.

**WHEREFORE**, the New York Plaintiff, on behalf of himself and all members of the New York Class, seeks the following relief:

      A.      Certification of this case as a class action pursuant to Rule 23;

      B.      Designation of the New York Plaintiff as the representative of the New York Class and counsel of record as Class Counsel;

      C.      Issuance of a declaratory judgment that the practices complained of in this Complaint are unlawful under the NYLL, Article 6, §§ 190 *et seq.*, NYLL, Article 19, § 650 *et seq.*, and the supporting New York State Department of Labor Regulations;

      D.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

      E.      Appropriate statutory penalties;

      F.      Appropriate equitable and injunctive relief to remedy the Campaign's violation of New York law, including but not limited to an order enjoining the Campaign from continuing its unlawful practices;

G.      Penalties, as provided by law;

H.      A reasonable service award to compensate the New York Plaintiff for the time he

has spent and will spend attempting to recover wages for the FLSA Collective and/or New York

Class Members and for the risks he took in doing so;

I.      Attorneys' fees and costs of suit;

J.      Prejudgment and post-judgment interest, as provided by law; and

K.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the California Plaintiff, on behalf of herself and all members of the

California Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the California Plaintiff as the representative of the California Class

and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by Defendant

according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the California Plaintiff for the time she

has spent and will spend attempting to recover wages for the FLSA Collective and/or California

Class Members and for the risks she took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Michigan Plaintiff, on behalf of himself and all members of the

- 79 -

**App. 209**

Michigan Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Michigan Plaintiff as the representative of the Michigan Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Michigan Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or Michigan Class Members and for the risks he took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Wisconsin Plaintiff, on behalf of himself and all members of the Wisconsin Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Wisconsin Plaintiff as the representative of the Wisconsin Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Wisconsin Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or Wisconsin Class Members and for the risks he took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Illinois Plaintiff, on behalf of herself and all members of the Illinois Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Illinois Plaintiff as the representative of the Illinois Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Illinois Plaintiff for the time she has spent and will spend attempting to recover wages for the FLSA Collective and/or Illinois Class Members and for the risks she took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Minnesota Plaintiff, on behalf of herself and all members of the Illinois Class, seeks the following relief:

**App. 211**

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Minnesota Plaintiff as the representative of the Minnesota Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Minnesota Plaintiff for the time she has spent and will spend attempting to recover wages for the FLSA Collective and/or Minnesota Class Members and for the risks she took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the North Carolina Plaintiff, on behalf of himself and all members of the North Carolina Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the North Carolina Plaintiff as the representative of the North Carolina Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the North Carolina Plaintiff for the

- 82 -

**App. 212**

time he has spent and will spend attempting to recover wages for the FLSA Collective and/or

North Carolina Class Members and for the risks he took in doing so;

    G.      Attorneys' fees and costs of suit;

    H.      Prejudgment and post-judgment interest, as provided by law; and

Such other relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

    Plaintiffs demand a trial by jury on all issues so triable.


Dated: New York, NY           Respectfully submitted,
       March 30, 2020

                                    _____

                                      Justin M. Swartz
                                      Michael C. Danna
                                      **OUTTEN & GOLDEN LLP**
                                      685 Third Avenue, 25th Floor
                                      New York, NY 10017
                                      Telephone: 212-245-1000
                                      Facsimile: 646-509-2060
                                      jms@outtengolden.com
                                      mdanna@outtengolden.com

                                      Sally J. Abrahamson
                                      Hannah Cole-Chu*
                                      **OUTTEN & GOLDEN LLP**
                                      601 Massachusetts Avenue NW, Ste 200W
                                      Washington, D.C. 20001
                                      Telephone: 202-847-4400
                                      Facsimile: 202-847-4410
                                      sabrahamson@outtengolden.com
                                      hcolechu@outtengolden.com

                                      Gregg I. Shavitz*
                                      Tamra Givens*
                                      **SHAVITZ LAW GROUP, P.A.**
                                      951 Yamato Road, Suite 285
                                      Boca Raton, FL 33431
                                      Telephone: (561) 447-8888

**App. 213**

Facsimile: (561) 447-8831
gshavitz@shavitzlaw.com
tgivens@shavitzlaw.com

Michael Palitz
**SHAVITZ LAW GROUP, P.A.**
800 3rd Avenue, Suite 2800
New York, NY 10022
Telephone: (800) 616-4000
Facsimile: (561) 447-8831
mpalitz@shavitzlaw.com

***Attorneys for Plaintiffs and the Putative Collective
and Classes***

*to apply for *pro hac vice* admission

- 84 -

**App. 214**